## BANK OF ST. MARYS, WINTER, ET AL.,

*vs.*

## ST. JOHN, POWERS & CO., AND HENLEY.

1. The note-holders of a foreign banking corporation, which has suspended payment and become insolvent, may, without first obtaining a judgment at law, proceed in equity against the bank, its directors, stockholders, and agents; charging them with fraud and misapplication of the assets, and seeking a discovery and account. Such a bill may be maintained under the general powers and jurisdiction of the court, which regards the capital stock of the company, and all its assets, as a trust fund for the payment of its creditors, and the directors, stockholders and agents as trustees.

2. As against the bank, if the bill is verified by affidavit, and alleges that the bank is located in another State, and has property and choses in action in this State, it may also be sustained under the attachment law of 1846; and if it further alleges that the notes were issued and put in circulation in this State by the president, who is charged to be the principal stockholder and a non-resident, it is also well filed against him under that act.

3. When a bill in equity is filed, under the attachment law of 1846, against a debtor who is alleged to be a non-resident, the defendant cannot deny his non-residence.

4. If the president of a foreign bank is required by its charter to be a resident of the State in which it is located, he cannot, when sued by its creditors here, be heard to deny the character in which he held himself out to the world, nor aver that he was not qualified to hold that office by reason of his residence in this State.

5. The surrender to a bank agent of its notes, and the acceptance from him of his draft on a third person, is but the substitution of one security for another, and does not extinguish the original liability on the notes, unless the draft is drawn in good faith, and accepted as an absolute payment and discharge of the notes; and even if it was, through the fraud of the agent, accepted as an absolute payment, the fraud would prevent it from so operating.

6. If the defendant, after an irregular decree *pro confesso* has been entered against him, appears by solicitor, and makes motions in the cause, without objecting to the irregularities in the decree, he will be held to have waived them, and cannot take advantage of them on error.

7. A decree *pro confesso* will not be set aside to allow a plea to be filed.

8. If a bank allows its stockholders to withdraw its funds to the amount of their subscriptions, and to use them, without security, in their private business, such conduct is a fraud on its creditors, which renders the directors liable in equity for the amount so withdrawn, and each agent who participated in the fraud individually responsible for the amount traced to his hands and all profits made from its use.

9. An officer or stockholder of a foreign banking corporation, who issues and puts in circulation in this State its notes, is individually liable for their payment.—Clay's Dig., p. 133, § 3.

Bank of St. Marys et al. v. St. John, Powers & Co. et al.

10. If a bank, on the eve of insolvency, having notes out which it cannot redeem, and a large claim on a solvent stockholder for money lent, extends his debt by taking his notes, payable at two and three years, with its president as sole surety,—this is a fraud on its creditors, and they may proceed in equity directly against such debtor, without a judgment at law or process of garnishment.

11. When a firm is conducted under the individual name of one of the partners, the others, although they have given public notice of their interest in the firm, and are active, managing members, are dormant partners, and as such not necessary parties to a bill filed by the principal partner to enforce the payment of a firm debt from a debtor who contracted in ignorance of the dormant partners. (GOLDTHWAITE, J., *dissenting*.)

12. Stock in a plank-road company is a chose in action, which may be subjected in equity under the attachment law of 1846.

13. When a cause is submitted at a regular term of the court, and held under advisement until vacation on request of defendant's solicitor, the defendant cannot complain on error that the chancellor rendered his decree in vacation.

14. When defendants are held liable on the original bank notes held by complainants, they are liable only for the amount of the bills and interest, and not for statutory damages on a draft which was substituted for the notes, and was protested for non-payment.

APPEAL from the Chancery Court of Mobile.
Heard before the Hon. J. W. LESESNE.

THIS bill was filed on the 24th April, 1852, by St. John, Powers & Co. and John Henley, against the Bank of St. Marys, a corporation chartered by and located in Georgia, John G. Winter, a citizen and resident of Georgia, Joseph S. Winter & Co., John C. Holcombe, L. B. Moody, and Tarleton & Whiting. It alleges that complainants are the holders and owners of a bill of exchange for $20,000, dated at Bank of St. Marys, Columbus, Ga., April 5, 1852, drawn by Geo. W. Winter, as cashier of said Bank, on said Holcombe, payable to the order of John D. Carter, and by him endorsed; that this draft was accepted by Holcombe before maturity, was duly presented for payment at maturity, and, payment having been refused, was protested for non-payment, of which the drawer and endorser were duly notified; that complainants, about 5th April, 1852, were the holders of $20,000 in bills purporting to have been issued by the Bank of St. Marys, payable on demand; that they presented these bills for payment at the said Bank, but payment was at first refused; that,

after some negotiation with the officers of the Bank, they gave the said draft for the said notes, and the notes were thereupon surrendered; that the draft was received for the accommodation of the Bank, and on the express assurance of its officers that it would be promptly paid; that said Holcombe was at that time the agent of said Bank, and of said Joseph S. Winter & Co., but his individual responsibility afforded no security whatever, and was not relied on by complainants in accepting said draft; that they accepted the draft on the positive assurance, and also on the expectation raised by the known relations subsisting between Holcombe and the other parties, that it would be paid out of the effects in Holcombe's hands, belonging either to the Bank or to Joseph S. Winter & Co.

The bill further alleges, that the Bank of St. Marys was chartered by the Legislature of Georgia in 1836, with a capital of $50,000, and located at St. Marys, a small town on the Atlantic coast, where it transacted business for several years; that while thus in operation it attracted the attention of John G. Winter, who in some way obtained control of its stock, and procured from the Legislature of Georgia a change in its location to Columbus; that, after its location at Columbus, its principal business was really conducted at Montgomery, Alabama, by John G. Winter and Joseph S. Winter & Co., in its name; that John G. Winter is the president, has the entire charge and management of its affairs, and is the principal stockholder; that he has exercised his power and control over the Bank to carry on his own individual business, and that of J. S. Winter & Co.; that they issue the notes of the Bank at Montgomery, in all the operations of their business, and redeem them there at a small discount; that it is publicly known and understood that any business with the Bank can be transacted at Montgomery through the firm of J. S. Winter & Co.; that there are now in circulation in this State, of the notes thus issued at Montgomery, from the best information complainants can obtain, at least $500,000.

It further alleges, that the charter of the Bank requires seven directors to be chosen, four of whom make a quorum, and limits the debts to three times the amount of capital paid in, and makes the directors individually responsible for any excess; that it requires an annual election of directors, who

must be residents of the State of Georgia, and from them the president must be chosen; that no election of directors has been known to have been held for several years past, and no board of directors has been summoned or consulted by the president for more than two years; that the president exercises an unlimited and unrestrained discretion in the management of all its affairs, and has used the name of the Bank as a device by which he could carry on the business of banking, and issue bills for circulation in this State, against the policy and statutes of the State; that the notes of the Bank held by complainants were issued by J. S. Winter & Co. at Montgomery, and were acquired by complainants in the regular course of business; that the president and cashier of the Bank, at the time said draft was drawn on Holcombe, knew that it had no funds with him, and that J. S. Winter & Co., after the draft was drawn but before its maturity, withdrew from him all the effects which were standing in their names; that John G. Winter and Joseph S. Winter & Co., through the means aforesaid, have acquired a large property in real and personal estate, stocks, &c., while the Bank has suspended payment, and become insolvent; that they are legally responsible for the debts of the Bank, because they have long since withdrawn from it whatever capital the Bank may have once had; that they knew long since that the Bank had a fictitious basis, and that it would never redeem the notes which they were putting in circulation; that they are also liable to the creditors of the Bank for the sums which they have withdrawn from it, and for which they have never accounted; and that they have become legally and equitably bound to pay the said debt.

It is further alleged, that the Bank of St. Marys is located in Georgia, and that John G. Winter also resides there; that Holcombe, Moody, and Tarleton & Whiting reside in Alabama, and have effects of John G. Winter in their hands; that Jos. S. Winter & Co. reside in Montgomery, and have effects of the said Bank in their hands, "and are also liable to pay complainants' debt, in the manner above stated, as parties and partners directly interested and concerned in the circulation of the bills of said Bank, as having used them for their own emoluments, without accountability or control, and as debtors

of the Bank." The Bank, John G. Winter, and Joseph S. Winter & Co. are particularly interrogated as to all the transactions between them, and the other matters charged in the bill; and the prayer is, "that an attachment may issue to seize the effects that may be found in this State, either of the said John G. Winter or the Bank of St. Marys, in the hands of the parties to this bill, or elsewhere; that Joseph S. Winter & Co. be enjoined from disposing of the effects in their hands, or under their control, either of the said John G. Winter or the said Bank; that the said Holcombe, Moody, and Tarleton & Whiting be placed under a similar injunction as to all the effects of the said Bank or John G. Winter, either individually or as a member of said firm; that the said Bank of St. Marys and John G. Winter be decreed to pay complainants' draft out of effects attached under this bill, and if they are insufficient, that other process may issue to seize other effects of the said parties; and that such other and further relief be granted as may be consistent with the case made by the bill, and with equity and good conscience."

The bill was verified by the oath of Newton St. John, one of the complainants, and an attachment and injunction were granted according to the prayer of the bill. A decree *pro confesso*, on publication, was entered against the Bank and John G. Winter, on the 26th July, 1852; and on the same day John G. Winter and Joseph S. Winter filed their answers. John G. Winter alleges that he was a citizen of Alabama at the time the bill was filed, and also sets this up as a plea; and further alleges that he was not indebted to the Bank, and had none of its property or effects in his hands, except that he was liable to the Bank, as surety of Joseph S. Winter, on certain notes executed about the 1st April, 1852, payable in two and three years, the aggregate amount of which exceeded $100,000. Joseph S. Winter & Co. answer that they were not indebted to the Bank, but on the contrary the Bank was largely indebted to their firm. Holcombe's answer admits assets in his hands belonging to Joseph S. Winter & Co. to the amount of $18,971, to the Bank $510 25, and to John G. Winter $48 18. Tarleton & Whiting denied all indebtedness whatever.

The Bank afterwards appeared by solicitor, and sued out a commission to take its answer; and subsequently moved to

set aside the decree *pro confesso*, and for leave to file its an-
swer, in which it sets up, by way of plea, that a suit was com-
menced against it in Georgia, by John Henley, on the said
draft, which resulted in a verdict and judgment in its favor.
An amended answer was subsequently filed by Joseph S. Winter
& Co., in which they allege, as a newly discovered fact, that
James Farley and Thomas J. Moulton were interested as
partners in the firm of John Henley, and were therefore neces-
sary parties to the suit.

The testimony in the cause is very voluminous; such por-
tions as are material to the points here presented are stated
in the annexed arguments of counsel, and in the opinion of the
court. The cause was submitted for final decree during term
time, but was held under advisement by the chancellor, and
the decree subsequently rendered in vacation. The chancellor
held, that the bill was well filed; that the defence set up by
John G. Winter, as to his residence in this State, was not
sustained by the proof, and, even if it were proved, could not
avail him, because the grounds on which the attachment was
sued out are not traversable; that Moulton and Farley were
not necessary parties to the suit; and that the complainants,
on the case made by the pleadings and proof, were entitled
to the relief prayed. He therefore rendered a decree in favor
of the complainants, against the Bank, John G. Winter, and
Joseph S. Winter & Co., for the amount of the draft, with
interest and five per cent. damages thereon, and condemned
the assets and effects attached to its payment. On this decree,
and the other proceedings in the cause, numerous errors are
assigned, for which see the argument of the appellants'
counsel.

JOHN A. ELMORE and THOS. H. WATTS, for appellants:

To show error in the decree we make the following points:

We say that there is no equity in the bill of complaint,
either upon general principles of equity jurisdiction, or un-
der the statute of 1846.

1. As to the equity against the Bank, independent of the
statute of 1846: The bill of complaint seeks a recovery on a
bill of exchange for $20,000, and if this cannot be done, then
it seeks a recovery on the bank bills, given for the bill of

exchange. So far as the Bank of St. Marys is concerned, this is, unquestionably, merely a simple contract debt, a liability on the bill of exchange or on the bank bills. There is no judgment against the Bank ; and the Bank has not been dissolved. There are no funds, assets, or other property of the Bank, upon which the complainants have any lien or trust given, either by express contract, or by operation of law. It is not shown that the transaction on which the bill is filed took place in this State, unless the receipt of the bank bills here is of that character. And as to this, the complainants allege that this was an illegal transaction, both by the laws of Alabama and Georgia, and without authority from the Bank, or its directors ; that John G. Winter and J. S. Winter & Co. issued them here, in violation of the laws of Alabama, and in the express violation of the Bank charter ; and it is proved that Henley was aiding them by his efforts,—that he was sustaining the credit of these illegal issues down to within a few days of the suspension, and even after the protest of the bill of exchange.—Clay's Dig., § 48, p. 353. Now the universal rule is, that simple contract creditors cannot ask relief in equity until they have exhausted their legal remedy, unless they have some lien or trust, or unless some statute gives the remedy.—See Sanders & McLaughlin v. Watson, 14 Ala. 198; Beck v. Burdett, 1 Paige 305; Brinkerhoof v. Brown, 4 Johns. Ch. 671 ; McDurmot v. Strong, 4 ib. 687; Reese & Heylin v. Bradford, 13 Ala. 837; Bloodgood v. Hartley, 16 ib. 233; Roper v. McCook & Robertson, 7 ib. 318.

2. As to equity against John G. Winter and J. S. Winter & Co. : But first as to John G. Winter : There is no judgment against him. He occupies in no respect the relation of a trustee of the complainants. His relation is that of a trustee of the Bank, and of the corporators—the stockholders of the Bank. The only way in which, by possibility, he could be held personally responsible as a trustee to creditors, would be by reason of his responsibility to the Bank or to the stockholders, and the liability of the Bank or the stockholders to complainants ; thus working out an equity in favor of the complainants, by some sort of subrogation to the equities of the Bank or stockholders. This, however, can only be done after a judgment at law against the Bank, and after exhaust-

ing the legal remedies ; and then it is not a personal responsibility, but a lien or trust on the property of the Bank. And this responsibility, lien, or trust, could not exist in favor of the Bank, so as to be transferred to its creditors, neither could the right of subrogation, as to this, exist, if it was personal responsibility for mismanagement and breaches of trust; for these would be choses in action of such character, that no trust or lien on them could be transferred by contract, and, of course, by no operation of law. This right of subrogation attaches to property—things existing as property only—and not to such choses in action as are mere rights to recover damages. Could the Bank make an assignment to complainants of all its rights of action against Winter for his mismanagement and breaches of trust, which would enable them to file a bill in their own name against him ? Neither does the case stand as one where creditors of a corporation are seeking to make stockholders liable for unpaid stock not called in by the corporation ; because the liabilities of such stockholders as to this unpaid stock are debts by contract, payable when they are called for ; and when they are called for, the stockholders owe the amount, and may be sued at law. In such case, the bill of the creditors of the corporation is filed to have the stock called in, to do what is the duty of the corporation, which duty it has failed to perform ; and in such bill these facts must be alleged, and it must be further shown that the creditors have obtained their judgments at law, and have had execution returned unsatisfied.—See Godwin *et al.* v. McGehee, and the authorities before cited. The demands against John G. Winter for the breaches of trust are essentially of the character of damages. If an action at law could be maintained against him, it could only be an action on the case. There is no pretence that he has any property or assets of the Bank, on which complainants have any lien or trust created by contract, or by operation of law. None such is specified, nor is the bill filed to enforce any such lien or trust on property of the Bank. It is filed to make him personally liable as a trustee of the complainants, or as a trustee of the Bank for his acts. of bad faith, to whom by the rights of subrogation the complainants have succeeded. The vagueness, uncertainty and generality of the allegations as to the conduct of the

Winters are fatal on demurrer.—See Story on Plead., §§ 241, 242, 243. The bill should state, with accuracy, and clearness, and precision, the right, the injury and the relief sought. All the allegations of the bill as to the Winters, (giving the most favorable construction to them for complainants,) establish no more than that J. G. Winter and J. S. Winter & Co. are liable at law, personally, for this debt—in fact, that the debt is theirs—the bills of the Bank issued by them on their own account, and for considerations personal to them. No property or effects of the Bank are alleged to be in their hands, specified as charged with any trust; but they are charged with being liable, personally, because by the means aforesaid they have accumulated property, while the Bank and its creditors are losers. They cannot be made liable, personally, until the complainants have obtained judgment at law, and the legal remedies exhausted. Is there any personal trust or fiduciary relation between John G. Winter and complainants, or Winter & Co. and complainants? When did it arise, and from what transaction?

It is said, that it is a bill for discovery, and that this gives the court jurisdiction. But we say, it is not filed as such, but solely as a bill for relief as contradistinguished from a bill for discovery. But suppose the discovery given; the discovery sought, if given, would make the case stand as alleged in the bill; and still there would be no equity in the bill. The bill must make a case of equity and ask for a discovery, which, if given, would make out such a case. But this bill makes and asks for nothing which would make a case in equity. The bill is not in aid of any suit at law. The prayers of the bill, in connection with the facts, show that the pleader intended it not as a bill under general equity rights, but as resting on the statute of 1846.

As to J. S. Winter & Co.: They are not directors or stockholders, and are not charged even as occupying any confidential relation to the Bank. It is not charged that they were the agents of the Bank; and the argument as to John G. Winter applies with greater force as to them.

As to J. S. Winter: He is mentioned in the beginning as a party individually; but no process is prayed against him individually. Nor is any discovery sought from him, as such;

nor is any prayer against him; nor any process, in fact, issued against him. Simply stating fraud or trust, is not sufficient to give jurisdiction.—See Knotts v. Tarver, 8 Ala.; Colburn v. Broughton, 9 *ib.* 351.

As before stated, the bill is filed to recover on a bill of exchange for $20,000, and if this cannot be done, to recover on the bank bills given for it. So far as the Bank is concerned, this is merely a simple contract debt; a liability on the draft or on the bank bills. As to J. G. Winter and J. S. Winter & Co., or both, and their liability, as being in fact the Bank or placed in its stead, the character of the contract is not changed. If they are liable, it is a liability to pay a simple contract debt of the Bank, for the payment of which their responsibility grew out of their conduct. All the fraud, breaches of trust to the Bank or stockholders, use of the bank bills, &c., are simply the statement of facts, from which a liability on the part of the Winters to pay this simple contract debt of the Bank is deduced. All that is alleged cannot make them more liable to pay this debt, than if they were parties to the bill of exchange. No trust of exclusive or concurrent equity jurisdiction is charged. The complainants cannot, therefore, go into equity until they have exhausted their legal remedies, unless by some statute giving jurisdiction to the Chancery Court in some mode not known to the common law. If the complainants seek to make J. G. Winter or J. S. Winter & Co. liable, as holding property which a court of equity regards as the property of the Bank, held in trust for the benefit of the creditors of the Bank, then the proceeding is on the ground that this trust property shall be held liable to the payment of the debts of the Bank. It is not on the ground that the debt sought to be recovered is the debt of John G. Winter, or of J. S. Winter & Co., and the property held by them, although they may hold the legal title, is regarded as the equitable estate or assets of the Bank, as to its creditors. If so, what is the remedy of the creditors? The universal rule, says Judge Dargan, in Sanders & McLaughlin v. Watson *et al., supra,* is that the creditors must exhaust their legal remedies before equity will or can take jurisdiction, unless some lien or trust exists, or unless some statutory provisions authorize it.

All the alleged violations of the charter of the Bank by J. G. Winter, or J. S. Winter & Co., by which penalties have been incurred under the laws of Georgia, or by which a liability to pay this debt under the laws of Georgia, or the violations of the laws of Alabama by which a liability to pay this debt, accrues, cannot give chancery jurisdiction. These liabilities are either penalties, or simple contract debts, or statutory debts; and courts of chancery cannot, in the first instance, take jurisdiction of penalties, or debts not reduced to judgment, &c. No personal trust, and no lien on any property to pay such debt, is created in favor of the complainants by the violations of the charter, the breaches of the trust towards the Bank, or its stockholders, the excessive issue of the bank bills, the issue of the bank bills and their use in Alabama, or the representations charged in the bill as fraudulent. All these facts are but reasons, at most, showing the liability of J. G. Winter and J. S. Winter & Co. to pay a simple contract debt, and furnish no good ground for a court of equity to interfere in behalf of complainants and compel the payment of such debt or liability, unless it was shown that complainants had exhausted their legal remedies. The bill shows no indebtedness of John G. Winter or J. S. Winter & Co. to the complainants. The debt sought to be collected is that of the Bank of St. Marys to the complainants. This debt is evidenced, either by the bill of exchange, or by the bank bills given up to the Bank on the delivery of the bill of exchange. There is in the bill of complaint no charge of any debt or contract of John G. Winter or of J. S. Winter & Co. Then the whole grounds upon which John G. Winter is sought to be charged or made liable, are : 1st, that he had used (fraudulently) the bills or property of the Bank in his business, so as to make large profits, acquire lands, &c., to himself, and that the profits, lands, &c., must be held, in equity, as the property still of the Bank, as to the creditors of the Bank ; and, 2d, that he is indebted to the Bank, by use of its property, or by use and circulation of its bills, without accounting therefor to the Bank ; (and these are the grounds upon which J. S. Winter & Co. are sought to be made liable ;) 3d, that he has violated the charter of the Bank by over-issues ; and, 4th, that he and J. S. Winter & Co. have put in circulation

the bills of the Bank in the State of Alabama. Now, the first two grounds are only that the Winters, in equity, are liable to account to the Bank, and are, in equity, its debtors, so far as creditors of the Bank are concerned. As to these two grounds, there is not the semblance of indebtedness to the complainants. As to the third and fourth grounds, there is no pretence of a contract, either express or implied, with the complainants. If there is any liability on these two last grounds to the complainants, it grows out of penalties imposed by the statutes of Georgia and Alabama. A court of equity can never be invoked to enforce a penalty, until judgment at law has been obtained and the legal remedies exhausted.

It necessarily follows, from these positions, that there is no equity in the bill of complaint, independent of the statute of 1846, against J. G. Winter and J. S. Winter & Co. The counsel for the appellees have cited numerous cases in support of the general equities of the bill, independent of the statute of 1846 ; but, when carefully examined, they all support the position here maintained. When the charter of a corporation has expired, and the stock and other property have been divided amongst the stockholders of the corporation—when, in other words, the corporation no longer has a legal existence, a bill may be filed and maintained against the stockholders by simple contract creditors of the corporation, to have payment out of the stock and property thus divided ; because there can be, under such circumstances, no legal remedy against the corporation, and the property thus divided is held to be a trust fund to pay the debts of the corporation. 15 Mass. 505, 522 ; 16 *ib.* 9, 12, 13, 15 ; 3 Mason 308-10-11-12. In the last case (from 3 Mason) the decree was, that the stockholders should pay in proportion to the amount received by each. The following cases cited by the counsel for the appellees, viz., 5 Hamm. 162; 3 Louis. 568 ; 2 Johns. Ch. Rep. 385-89; 4 B. Mon. 91-96 ; 10 Monroe 84 ; 5 Paige 607; 3 *ib.* 222 ; 20 Eng. Ch. 428; 29 *ib.* 180; 16 *ib.;* 2 Atkyns; 2 Story's Eq., § 1252,—all hold that the legal remedies must be exhausted against the corporation, before equity will take jurisdiction in favor of creditors. The case in 3 Paige holds, that the stockholders may file their bill against the directors for

fraudulent or gross mismanagement of the funds of the corporation. Why? Because there was no legal remedy of which the stockholders could avail themselves; and because, as to them, there was a trust from the directors. The portion of the opinion relied on in 2 Johns. Ch. 384, was a *dictum*, and was spoken generally, and is no authority.—5 Paige 607. In this case, a judgment had been rendered against the corporation. Moreover, under the charter, a creditor at large could sue.—*Ib.* 608-612.

As to the equity under the statute of 1846:

1. As to the Bank of St. Marys: The charter, which is made a part of the bill of complaint, shows that the Bank is not liable for the payment of the draft or the bills for which it was given. The bill of complaint does not allege that the draft or bills were signed by the President, and countersigned by the cashier, as required by the charter. The allegation of liability by the Bank to pay the draft or bills, is not a statement of a fact, but is simply the statement of a legal conclusion. The statute of 1846 requires that there must exist and be distinctly charged in the bill, and sworn to as charged, an indebtedness to the complainants.—See Statute, p. 17, (Acts 1846); see, also, McGown v. Sprague, 23 Ala. 524.

2. As to J. G. Winter and J. S. Winter & Co.: Under the statute of 1846, there is no such indebtedness of John G. Winter, or of J. S. Winter & Co., to the complainants, as to authorize a court of chancery to issue an attachment against them, or either of them, as primary debtors to the complainants. The act requires that the indebtedness shall be to the complainants, and must be sworn to exist as charged in the bill of complaint. There is no affidavit setting forth any indebtedness of J. G. Winter, or J. S. Winter & Co. to the complainants. Without such allegation in the bill, and without such affidavit, the Court of Chancery has no jurisdiction against them as primary debtors.—See McGown v. Sprague, 23 Ala., *supra.* If no decree can be rendered against the Bank, the debtor of complainants, under the facts of the record, (which is hereinafter further considered,) no decree can be rendered against the Winters as debtors of the Bank, or as holding property of the Bank. But even if a decree can be rendered against the Bank, still, no decree can be rendered

against J. G. Winter and J. S. Winter & Co. in their capacity of garnishees, first, because they deny having property of the Bank in their possession ; and, secondly, because they deny any indebtedness to the Bank, except by such commercial paper (not due at the time of the decree) as is not subject to garnishment by the act of 1846. (See last section of the act.) These denials in their answers, as garnishees, are not controverted by the complainants on oath, (in analogy to such proceeding at law,) nor by replication, nor by proof.

As to the plea of John G. Winter : There are two pleas, one to the original bill, and one to the bill as amended—both the same in form and substance. They deny his residence in Georgia, and aver his residence in the State of Alabama, and he pleads this fact : 1st, to any matter by which it is sought to charge him as liable directly or primarily on the draft ; 2d, to any matter by which it is sought to charge him as liable on the consideration of the draft ; 3d, to the matter by which it is sought to charge him on account of his being a stockholder in the Bank, and the issuance of the bills of the Bank in the State of Alabama ; 4th, to the matter by which it is sought to charge him on account of the excess of the debts of the Bank over the amount allowed by the charter ; 5th, to any matter in the bill by which it is sought to charge him directly. These pleas were filed without exceptions, and no motion was made to strike them from the file, or to disallow them. We admit, that if the bill had been filed on the equities of the complainants against John G. Winter as they existed independent of the statute of 1846, and afterwards an attachment had been prayed and obtained as ancillary to the original bill, then the denial by Winter of his non-residence, and a plea of his residence in Alabama, though sustained by proof, would have the effect only of dissolving the attachment, and not dismissing the bill as to him. We have already discussed the equities of the bill to some extent, and (to our own satisfaction, at least,) shown that no right of proceeding against Winter existed, unless under the act of 1846. The statute of 1846 gives jurisdiction of the non-resident, solely on the ground of non-residence, indebtedness to the complainants, and that such non-resident has real or personal property of legal or equitable nature, or choses in action,

within the State of Alabama. There are three things necessary to give jurisdiction against the non-resident : 1st, non-residence ; 2d, indebtedness to complainants; and, 3d, that the non-resident has property of some character, within the State. The attachment is the leading process in the cause, and the equity of the bill—that is, the right to call upon the Court of Chancery for relief against John G. Winter—is based upon his non-residence, and cannot be sustained without such allegation. All the aspects of the bill show him to be liable in a court of law. The representations about the draft being met, his being a stockholder and issuing the bills in this State, his being one of the board of directors and permitting an excess of debts over the amount allowed by the charter, create legal liabilities only. The Court of Chancery can take jurisdiction of legal liabilities, only when some other fact supervenes ; as in this case it is alleged, that John G. Winter resides out of the State, and without this allegation the court had no jurisdiction. The act of 1846 does not merely give attachment process, but confers jurisdiction in a class of cases in which, before that statute, the Courts of Chancery had no jurisdiction whatever, until the legal remedies were exhausted. A suit in this court could not be commenced on any of this class of cases in any other mode than by attachment.— The jurisdiction of the court depends on this process, and will be defeated unless this process is executed by a levy.— The non-residence of John G. Winter, being a fact essential to the jurisdiction of the court under the statute, was necessary as an allegation of the bill, and as such was averred and required proof. John G. Winter had the right to controvert this fact, and prove that an essential ground of the complainants' right to the aid of the court did not exist.

If it be said that he could not make this defence by plea alone, but must answer, we reply that no objection was ever made to the mode of defence, even at the hearing. This, too, was an attempt by the complainants, not only to commit a wrong against Winter, but to perpetrate a fraud on the court, by averring, as a fact, that which was false, and without which averment the court could not take cognizance of the cause. If the fact of Winter's residence in the State had appeared in the bill, the objection to the jurisdiction could have been

made by demurrer alone, or by a motion to dismiss for want of equity. When the objection does not appear in the bill, it must be made by plea. That this was an attempt to commit a fraud on the court, and that the plea was not an improper mode of defence, we refer to a case similar in principle.—Bentley v. Cleveland, 22 Ala. 814.

The statute allowing attachments at law did not confer a new jurisdiction, but gave an additional remedy ; and before the passage of the act the defendant might contest the ground on which the attachment issued and defeat the action. He was not required to answer the declaration. In the courts of the United States, a defendant may deny that the plaintiff resides out of the State. ' A defendant in chancery may surely plead to the jurisdiction, without being compelled to answer the bill ; and as no exceptions were taken to the plea, it was admitted as a full answer to the bill if the facts were true.— The law, especially as it is administered in this court, abhors circuity of actions. If the plea is true, this court will not permit the complainants to triumph in the success of their fraud both on Winter and the court, and turn him around for relief to his action at law. This, however adequate it might be for his redress, would be no vindication of the court from the fraud on its jurisdiction, and a party is never permitted to take any benefit from his own wrong, fault or negligence. On the defence at law, see following cases : Brown v. Massey, 3 Stewart 226 ; Mantz v. Hendly, 2 Hen. & Munf. 312 ; 2 Caines' R. 318 ; 2 Kent 323.

The only cases denying this doctrine, are O'Neal v. Owens, 1 Hay. 365, and Middlebrook v. Ames, 5 Stew. & Port. 158. The first is a *nisi prius* case, and the latter did not decide it. The question was considered, but was not a point decided, and is a *dictum* only by Judge Saffold ; while opposed to his opinion is that of Judge Taylor, who entirely sustains the New York and Virginia cases. The plea by Winter is a plea to the jurisdiction, both in form and substance ; it is in form a plea : the conclusion is a prayer that the court will not take jurisdiction as to him. At law, the beginning and conclusion of the plea determine its character ; in chancery, the substance, and not the form, is regarded. The plea was a full answer to those parts of the bill by which a recovery was

sought on the bill of exchange or on any ground upon which he was legally liable.—Bentley v. Cleveland, *supra.*

This plea was sustained by the evidence. It is clearly shown that for a long time before the commencement of the suit he had ceased to reside in Georgia, had sold his residence in Columbus, and was living in the State of Alabama, claiming it as his residence. It is supposed by the adverse counsel, that the failure to establish his residence in the county of Montgomery is a failure to establish the plea, inasmuch as the averment was that he resided in that county at the time of filing the bill. While we admit, that probably he could establish his residence in the State only by proving his residence in some particular county, yet he is not held to prove his residence in Montgomery county, because he alleged that as the place of his residence. The issue was not as to the county in the State where he resided, but was as to the State where he resided. The allegation as to the county was surplusage ; strike it out, and the plea is good. The evidence showed his residence to have been in Coosa county.

It is insisted, however, that John G. Winter is estopped from denying that he resided in Georgia, because he held himself out to the world as the president of the Bank, and the charter requires this officer to be a citizen of that State. We are of the opinion, that he would be permitted to deny that he was the president of the Bank, or acted as such, in a suit brought to charge him in that character for any act done by him, unless it was alleged and proved that the party seeking to charge him acted on the faith of such declaration, and thereby acquired a right of action against him. But there is no allegation in the bill of any declaration by Winter, or any act of his, relating to his place of residence, on the faith of which the complainants relied and acted, so as to have acquired a right of action against him. The case relied on by the adverse counsel, from 2 Conn. 223, only sustains the general doctrine ; there the party held himself out as owner, and thereby induced others to deal with him in that character.

The decree *pro confesso* against the Bank is full of errors. We insist, that the order of publication must be in conformity with the rules of practice, and the requirements of the act of 1846. The Bank cannot be brought into court by a defective

order, although its terms are complied with ; nor can it be brought into court by a proper order of publication, without there is actual publication in compliance with the order. The decree *pro confesso* must set forth the order, and the facts which constitute a compliance with the order. The rules require publication for four consecutive weeks, and that a copy of the order should be sent by mail to the principal officer of the corporation, when it is a foreign one. The order is defective in both these particulars. It is a necessary requisite that the order should be for four consecutive weeks, and that the publication should conform to this requirement, because the rules intended it to be for four consecutive weeks, and publication might be made for four weeks but not consecutively. It is also as necessary that the order should require a copy to be sent to the principal officer of the corporation, as to be sent at all. Domestic corporations are made parties in suits, not by service on the corporation, for that is impossible, but by service on the person whom the law regards as principally representing the corporation ; and it must in all · cases be proved that the person upon whom the service was effected was the principal officer of the institution, or the one whom the law regards as representing it. This rule is not an useless one, but substantial and important.—Lyon v. Lorent, 3 Ala. 150.

The decree neither conforms to the order, the rules of practice, nor the statute of 1846. It recites that the terms of the order having been fulfilled as appears by the affidavits in the cause. The affidavits, however, cannot be looked to, even to sustain the decree.—Hamner v. Mason, January term, 1854; Bloodgood v. Hartley, 16 Ala. 233; Butler v. Butler, 11 *ib.* 668. Neither do the affidavits, when referred to, show a compliance with the order. The decree does not recite the facts, but gives the legal conclusion, and refers to the affidavits for the facts on which this conclusion is founded.. The affidavits refer to the order for what was done, and say it was done in pursuance of the order. The decree might just as well have said, "the order having been complied with in all its terms, it is therefore ordered," &c. The whole is going round in a circle. Elliott v. McLelland, 17 Ala. 206. The omission in the decree to show, by the facts, a compliance with each or any term of

the order, is as fatal as if the record showed that no part of the order was complied with. The publication brings the party into court; he is not in court until the end of the four consecutive weeks of publication. By the order, the publication is to be commenced within fifteen days after the date of the order; the rule requires it to be done in forty days; neither the decree nor affidavits show the day on which the publication commenced. If we can refer to the affidavits, it appears to have commenced within fifteen days after the date of the order, which was the 2d of August. If the publication began on the 10th of August, eight days after the order, and continued for four consecutive weeks, the time expired on the 6th September. The Bank, if everything else was regular, was not in court until that day, and then only by constructive service. We cannot presume it was in court at an earlier day. There is no definite day on which we can presume it was in court, unless we compute the time of publication from the 17th of August, the 15th day after the date of the order. No intendments are made to supply the defects of the record in such cases. If the Bank was then regularly in court on the 6th of September, within what time must it answer? We think it is entitled to thirty days after service, whether the service be actual or constructive. It was never intended to apply to parties served constructively, a more rigorous rule than to those having actual notice.—Code, 5th rule, p. 718; *ib.* 10th rule, p. 718; *ib.* 40th rule, p. 722.

The act of 1846, section 5, requires a publication of the substance of the bill. No order to that effect is made, and the decree does not show that it was done. The publication, without stating the substance of the bill, is nugatory.—See Act of 1846, § 5, p. 17.

These defects are supposed to have been cured by the decree *pro confesso nunc pro tunc,* rendered by the chancellor.— This decree was rendered in vacation, after the hearing, and on proof made in vacation, and without notice. These facts take this cause out of the rule laid down in 2 Ala. 415, a case which cannot, on principle, be sustained. Amendments of judgments must be made on matters *quasi* of record, at least. It is true that a sheriff may amend his return after final judgment; but there is no analogy between the act of the court

and the act of the sheriff : the latter acts on the responsibility of answering in damages to any one who is injured by a false return so made. It is a mere ministerial act. In the other case, it is a judicial power, and this cannot be exercised, unless on some matter of record in the court, or *quasi* of record. When a writ against two has been returned executed on one only, and a judgment has been rendered against the one served, as shown by the return, can the sheriff, at a term of the court subsequent to that of the judgment, amend his return showing service on both, and can the plaintiff then amend his judgment *nunc pro tunc*, and take it against both, without notice to the one against whom no judgment had been first taken ? If he was a surety, and had been discharged by some act of the plaintiff, he has had no opportunity of making his defence. The decree *nunc pro tunc* is not upon the minutes, but is embodied in the final decree. It is also fatally defective. It does not show a compliance with the act of 1846, as to the substance of the bill, or with the order of publication, or with the rules of practice. These two decrees *pro confesso*, the one made by the register and that by the chancellor, are separate and distinct: each must be complete within itself: neither can be aided by the other. The chancellor's decree does not show the terms of the order, or that there was any order of publication. It says, "publication against the Bank of St. Marys was made by publication," we ask by what publication, or by the publication of what ? Is it of the order ? The decree does not say so, nor can this court say so, because nothing can be taken by intendment ; but if it did refer to the order, we have already seen that it was defective, and there was no order *nunc pro tunc*, by the chancellor, amending the order of publication. This decree also says " a copy thereof," &c. A copy of what, we ask ? Was it a copy of the publication ? There was no copy sent to the principal officer of the corporation. There was no publication of the substance of the bill. The decree says, " having posted, &c., within the time prescribed by law, and the rules of this court ;" this is not a statement of fact. The rule on these points has all the strictness applicable to a plea in abatement. The statement must exclude a conclusion.

38

It is thought by the counsel for the complainants, and also by the chancellor, that these errors against the Bank have been cured by its appearing in court by counsel. If there has been an appearance in the cause by counsel for the Bank, it will not be permitted to urge the above objection ; but we look in vain on the record for evidence of such an appearance. A conclusive answer to this view is, that no decree *pro confesso* has been rendered on their appearance, but basing his decree on the decree *pro confesso* of the 4th of October, the chancellor has conclusively answered what was in fact a mere suggestion of his mind. After the decree *pro confesso* the Bank was in contempt, and could not appear in court for any purpose, except to purge the contempt ; and the only way in which that could be done was by filing a full and sufficient answer. On the 21st of January, 1853, in open court, on motion of defendants, it was ordered that the answer of the Bank be published. This was taken under a commission issued on the 13th of September, 1852. On being published, it proved to be a plea of former recovery. A motion was made in behalf of the Bank on tender of this plea, to set aside the decree *pro confesso*. This motion was denied, on the ground that it was not a full answer. To this plea counsel's name is signed, and the plea appears in the record, with the motion made and the action of the court thereon.— It may be regarded as part of the record, but it is no part of the pleadings in the cause. This is all the evidence of an appearance by the Bank. There was a decree, or what was treated by the chancellor and Bank as a decree *pro confesso;* and to set it aside to enable the Bank to appear, application is made in September for a commission to take the answer of the Bank ; in January following, on behalf of the Bank, what purports to be its answer is published, and on the publication the Bank asks to file, as its answer, what is in fact a plea, and to set aside the decree *pro confesso*. Everything that has been done by the Bank is to purge itself of the contempt, and to place itself in a position to appear by counsel in the cause. The motions made for this purpose do not cause an appearance by the Bank ; otherwise the Bank was appearing, and was represented by counsel in court, and had the right to make any objections and to be heard on the hearing, although

the decree *pro confesso* was in full force, as decided by the chancellor. This is an anomaly in practice.

The argument on this point is reduced to this: That the exclusion of the Bank from an appearance to the cause, really worked an appearance. When the Bank asked to be let in to defend and it is refused, it is now told that it was thereby in court. We think this point does not rest alone on principle, but is supported by authority.—Nabors v. Nabors, 2 Port. 162; Lecatt v. Salle, 1 *ib.* 287; 8 *ib.* 467; 3 Stewart 480. The Bank did not cross the interrogatories or take any part in the introduction of testimony; the defendant's solicitors who signed the interrogatories must be considered the solicitors alone of those who had the right to file them; the introduction of the record from the Inferior Court of Muscogee county, Georgia, cannot be intended as the act of the Bank; it had no right to introduce any testimony, but especially testimony relating to no issue. These records were irrelevant and should not have been admitted. An appearance is an act—an entirety. Unless some one of the various things done by the Bank, constituted of itself an appearance, all of them together do not make an appearance. In Wilkins v. Hall, 4 Porter 245, the *scire facias* was executed on the representative; he then appeared in person in court, and asked time. The case in 6 Peters 327 only decides that a demurrer filed and signed by counsel, is an appearance, if so intended by counsel. The case in 4 Johns. 99 decides that an answer filed, and orders taken under it, is an appearance. In this instance the Bank filed neither demurrer, plea, nor answer, and never appeared to the cause by counsel. A motion to set aside the contempt by filing the plea was all that was done, and this was no appearance. The Bank has the right to make this objection here—it had no opportunity of doing it before, and unless now heard, the error could not be reached.

There was error, also, in the refusal to permit the plea to be filed. It was a plea of matters that had occurred since filing of the bill, and since the last continuance of the cause. It should have been allowed, although the decree *pro confesso* was not set aside. But we have seen that the decree *pro confesso* was wholly void, and the chancellor had no right to disallow the plea at the time, and in the manner determined

by him. · It should have been filed, with leave to the plaintiff to except to it, or with such order on the same as might be made under the rules of practice. The chancellor did not pronounce upon the goodness of these pleas; he refused to consider this. If necessary to examine this question, we insist that the defence set up by the Bank was good. The pleas are two : one to all the grounds of relief stated in the bill, the other to the recovery sought on the draft. The only liability of the Bank 'was upon the draft, or upon the bills. If the suit at law was upon the draft, and a judgment was rendered for the defendant, the plaintiffs could not turn round and sue the Bank on the bills. This judgment was conclusive as to all matters which were involved in the suit, or might have been litigated under it, and conclusive as to all the legal consequences of the judgment.

The chancellor had no authority to render the decree in vacation. The record shows that the cause was heard at the April term, 1853, of the court. The decree itself, and the certificate of the register, prove it was rendered in August. The only authority to render decrees at any other time than the term at which the cause is heard is to be found in the statutory law.—Clay's Digest § 40, p. 352. Chancellors are expressly required, by the terms of the act, to render their decrees in writing at the term of the court when the cause is heard, " unless in weighty and difficult cases, in which he may be indulged to the ensuing term." There is no entry on the minutes of the court, that this cause " was weighty and difficult, and therefore the chancellor was indulged to the ensuing term to render his decree."

Another objection to the decree is, that Farley and Moulton were necessary parties. They were the partners of John Henley. This objection was taken by the answer. The complainants reply that these persons were dormant partners, and not necessary parties. We think this reply is not sufficient on the hearing or in the argument ; the plea alleges that these persons were partners of John Henley and joint owners of the draft. The bill is not amended so as to show that they were dormant partners, and the question of the character in which they stood in the partnership, was not put in issue as the pleadings stood : there was no replication to

the plea ; and the issue stood, were they partners of John Henley, and interested in the subject-matter of the suit.   If to a bill filed, the defendant pleads the statute of limitations, the bill must be amended so as to put in issue some fact which takes the case out of the statute ; otherwise, the only issue on this matter is, whether the time had elapsed since the right to sue accrued.   So here, the complainants could not prove these were dormant parties, when that was not the matter in issue.

But were they dormant partners ?   Such are defined to be those whose names and transactions as partners are professedly concealed from the world.—Collyer on Part., § 4, p. 3. The testimony abundantly proves that the names of these persons, and their transactions as partners with John Henley, were not professedly concealed, but avowed and published to the world, and that they were the active members of the firm in transacting its business.   The cases in 2 Harris & Gill, and 5 Cowen, which maintain that a partner is dormant, unless his name is mentioned in the firm, or embraced under general terms, cannot be supported.   If his name is embraced in general terms, this does not point out and identify him as the person meant—there may be many of the same name in the same place.   This rule is too uncertain, and the definition of Collyer is correct ; and it must follow as a conclusion, that one whose name and transactions as a partner are not professedly concealed from the world, is not a dormant partner.   It has been held that dormant partnerships are confined to trade and commerce, and this is the business of exchanging commodities, or buying and selling commodities.   It appears from the testimony that their firm was engaged in the business of dealing in exchange, and money brokers.   If so, then there could be no dormant partnership.—Pitts v. Waugh, 4 Mass. 424, 426 ; Smith v. Burnham, 3 Sumner 435, 470 ; 3 Kent, (5th ed.,) n. a.

It is insisted by the complainants, also, that they being the holders of the draft, endorsed in blank, might fill up the blank with the name of any person, and sue on it in the name of such endorsee.   Admitting this to be true, this blank has not been filled up with the names of complainants.   We contend, if it had been filled with the name of John Henley

and the other complainants, on proof that Moulton and Farley were partners with John Henley under that name, and as such were joint owners of the draft, the law would put the title and interest which passed to the John Henley endorsee, in the firm, and hold the endorsement to be to the firm ; and the failure to make such endorsement can make no difference, unless it is in favor of the defendants. We admit, that if the owner of the draft has it in possession, he may sue on it in his own name without filling the blank, or he may fill the blank with the name of any person he chooses and then bring suit thereon. But if the blank is not filled, and the suit is in the name of one who is not the owner, the suit would be defeated. This principle is plainly deduced from Bancroft v. Paine, 15 Ala. 834. The other cases only hold that the party in possession may fill up the blank, and if on the trial there is no evidence to rebut his ownership, he is presumed to be the owner, and being so, it need not be actually filled up.— Nor is this case within the exceptions in 15 Ala. Complainants are not shown to be agents to whom this draft was transmitted for collection. But however the law may be on this point, as regards the parties to the draft, it does not authorize a suit against persons not parties to the draft by any one, except those who are interested in the subject-matter of the suit. Neither of the Winters is a party to the draft, and cannot be made liable thereon, by a suit directly on it ; and when it is attempted to charge them on the subject-matter of the bill, all who have a real interest in that matter must be made parties. This is true also, as to the Bank, on that part of the bill by which it is sought to charge the Bank on any other account than the draft itself. To charge the Bank on this suit, the bill should have been dismissed as to every thing, except the allegations as to the draft.

The decree against J. S. Winter & Co. cannot be sustained. The bill, in the commencement, states that the suit is against J. S. Winter. It expressly alleges, that the firm is located in Alabama, and that J. S. Winter resides here. No relief against the firm could be given under the act of 1846, and as debtors to the Bank or John G. Winter, no indebtedness in the answer is shown. The decree can only be sustained on grounds of general equity, and this view has already been

presented. The same specific relief is prayed as against Holcombe and the other garnishees. The same process is asked against J. S. Winter & Co., as against Holcombe and the other garnishees. The nature of the allegations shows that it was intended to charge them only as garnishees or debtors, or having effects of the Bank liable to seizure. The firm occupied no relation of trustee to any one, neither the Bank nor creditors; it was not a stockholder, could not be a director, and could not, under the charter, be liable. They are brought in as garnishees, and in no other character, and in that character alone can a decree be rendered against them.—Tillinghast v. Johnson, 5 Ala. 514. Their answer shows no effects or indebtedness, which can, under the law, be attached; their answer is not contested, and not disproved.

The decree of the chancellor, ordering the shares of John G. Winter in certain corporations to be sold, is wrong. The bill does not proceed against these, makes no allegation in regard to them; they are incapable of levy by the sheriff; and the power to decree a sale of any effects or property, depends on the power of the sheriff to levy. If the bill had specified these stocks, and prayed that they should be condemned to pay the debt, and a sale for that purpose, it would present a different question; but on the return of the sheriff, that he had levied the attachment on certain shares of stock— that he has done what is impossible—the decree orders the sheriff to sell what he has not in his possession.

But, if the decree is correct in every other respect, it certainly is erroneous in allowing damages on the bill of exchange. If the right to maintain the suit is founded on the bank notes, for which the draft was substituted, no statutory damages could accrue.

HILLIARD & THORINGTON, contra:

The case before the court is one of extraordinary character. The bill charges the Bank of St. Marys, John G. Winter, and Jos. S. Winter & Co., with fraud seldom equalled in the annals of banking; and the complainants insist, that the allegations of the bill are fully sustained by the proof exhibited in the record. The case of complainants rests upon the gen-

eral and ordinary jurisdiction of courts of equity, and also upon the act of 1846, which authorizes attachments in chancery. In either view, the Bank of St. Marys, John G. Winter, and Jos. S. Winter & Co., are liable for the payment of the bill held by complainants.

*First:* It is a well-settled principle, that the president and directors of a bank are bound to conduct its affairs in good faith for the benefit of the creditors and stockholders, and in accordance with its charter. If they violate its charter, and misapply its funds, they are liable as *trustees*, and become *individually* responsible to the creditors and stockholders of the bank. Those who enjoy a charter have extraordinary privileges conferred on them : they are exempted by the act of incorporation from individual liability ; but they forfeit these privileges, when they violate the provisions of their charter, and can no longer claim its protection ; they then become personally liable as trustees. This principle is fully sustained by numerous authorities.—1 Edw. Ch. Rep. 513; 16 Eng. Ch. Rep. 52; 20 *ib.* 428; 29 *ib.* 180; 5 Paige 607-12; 4 B. Mon. 90; 5 Hamm. 162; 2 Atkyns 400; 2 Johns. Ch. 389; 6 *ib.* 160; 3 Paige 231; 3 Mason 308-13; 4 Leigh 233; 2 Lou. 568.

The strong allegations of the bill as to fraud on the part of John G. Winter and J. S. Winter & Co., are admitted, for their answers do not controvert these charges, but offer merely *technical* defences. The facts charged are within their own knowledge ; they cannot be ignorant of them ; and the allegations as to fraud and a violation of the charter of the bank under their control, are to be taken as confessed, for they decline to reply to them.—1 Story 172; 3 Bland 552; 7 Ala. 217. The allegations could not be denied, and they could not be admitted without exposing the parties to the stringent penal laws of Georgia.—See Prince's Dig. 633, §§ 37, 41.

Independent of this confession of the charges of the bill, there is ample proof to sustain them. The charter of the Bank is found in Prince's Dig. 134. The bill charges, that while the Bank was by its charter located at Columbus, Georgia, its chief seat of operations was at Montgomery, in this State, under the management of John G. Winter and Jos. S. Winter & Co.; that John G. Winter was president, and conducted its

concerns as he pleased, subject to no direction of the Bank; that hundreds of thousands of dollars of the bills of the Bank had been issued for the first time by that firm at Montgomery; that no election of directors had been known to have been held for several years, and that no board of directors had assembled for more than two years; that John G. Winter, as president of the Bank, used its bills without limit, and without accounting to the board, and that the Bank was used as a mere device to enable Jos. S. Winter & Co. to carry on banking operations within the State of Alabama, against its policy and contrary to its laws, solely for their own advantage, and that they might escape personal liability in their transactions; that by these means John G. Winter and Jos. S. Winter & Co. have accumulated a large property corresponding with the issues made; that the Bank had failed, was insolvent, and worthless; that when the draft of $20,000 was drawn by the Bank on Holcombe, and handed to the agents of complainants, both John G. Winter, president, and George W. Winter, cashier, knew that Holcombe had no funds to pay it, and that in the meanwhile Jos. S. Winter & Co. withdrew all the funds standing in their name in his hands; that Jos. S. Winter & Co. were attempting to buy up the bills at a depreciation; that John G. Winter and the firm of Jos. S. Winter & Co. are responsible for the debts of the Bank, because they have absorbed its capital, knew that the Bank had a fictitious basis, and put the bills in circulation knowing that the Bank would stop payment.

All the above charges, by failing to answer, they have admitted to be true; but to establish the strength of the case made out by the complainants below, we briefly refer to some of the facts proven, the mere statement of which establishes their right to recover, &c. It appears that the Bank of St. Marys was at Columbus, Ga.; Jos. S. Winter & Co. at Montgomery. John G. Winter gets control of the Bank of St. Marys, becomes its president, and by a subsequent act of the Legislature changes its location from the distant point of St. Marys to Columbus, the theatre of his own operations, and further has the former number of directors of seven reduced to the smaller number of five. This board of directors was made to consist of himself and his two sons, Joseph and George,

his co-partner in the flour-mills and confidential agent, L. B. Moody, and Dr. Wildman. Out of this board, three of the number formed a quorum, which, if occasion required, might at any time consist of the father and his two sons. David Waugh proves, that the firm of Jos. S. Winter & Co. was established in Montgomery in 1845, and this witness, also Barker, Cullom and Caldwell, all clerks of said firm, prove that Jos. S. Winter and L. B. Moody were for years citizens of Montgomery county. John G. Winter swears that *he* was a citizen of Montgomery, and his letter of the 26th June, 1850, was introduced to prove the fact.

Admitting, then, for the sake of argument, that John G. Winter is a citizen of Alabama, as well as his son Joseph, and his confidential friend Mr. Moody ; it is then in proof, that three of the five directors of said pretended Bank are citizens of Alabama, and were such a long period previous to the transaction on which the bill was filed. If we compare the facts and the law, we find that *three* of the five directors (a quorum) were not citizens of Georgia, but of Alabama ; and that the charter of said Bank specifically required that "none but citizens of that State should be eligible as directors," &c., and a penal statute making the violation of any provision of such charter a high misdemeanor, punishable by imprisonment in the penitentiary, &c.—Prince's Digest, p. 134 ; *ib.* 633. It follows, then, as a legal conclusion, that there being only *two* directors of said Bank citizens of Georgia, said Bank was incapable of transacting business, that number being less than a quorum ; that the pretended organization of the board of directors was a palpable violation of its charter ; that an attempt so to direct and manage the Bank was a criminal offence ; that, as it was impossible, under the charter and laws of the State, to carry on the operations of banking by such flagitious conduct, they (the directors) became individually liable for every act so performed, and cannot avoid it by interposing the subterfuge, that it was the Bank of St. Marys, and not John G. Winter, the president, and the firm of Jos. S. Winter & Co., that was liable. They were, under the proof, (admitting the claim of John G. Winter to citizenship of Alabama), for two years prior to the failure of the Bank, acting in violation of its charter and the laws of Georgia, using the Bank,

in the language of the bill, as a mere machine for their own individual benefit.

The parties defendant below were not only liable under the general principles of equity, but were expressly so under our statute, as follows : " Each and every person, who may be a partner, or stockholder, in any company, corporation, or unchartered banking association, shall be liable to the holder of any note, bill, bond or post-note issued, emitted, or put in circulation," &c.; " and recovery may be had before any court having competent jurisdiction."—Clay's Dig., 133, § 3.   The facts bring the case clearly within the statute ; and it must be remembered, the facts are not denied by the appellants. and, in the language of the chancellor, " the proof fully sustains, and in one or two important points, connecting the Winters with the Bank, and showing its irresponsible management with a view only to their own profits, goes even beyond the strong allegations of the bill."

The testimony of Moulton is conclusive upon the question of fraud on the part of the Bank as managed by the Winters, and their direct connection with it, in the suit at bar.   He proves positively that a majority in amount of the twenty thousand dollars of the bills of the Bank of St. Marys was put off by Jos. S. Winter & Co. upon John Henley & Co., at a small discount, for the bills of solvent banks, a few days previous to the failure of said Bank ; and that it was for the identical bills so received from Jos. S. Winter & Co., and other bills of the Bank, that the said draft was given.

Holcombe proves, that at the time the draft was drawn on him, John G. Winter, president, and Geo. W. Winter, cashier, knew he had no funds to pay it, &c.

The testimony of McArn connects L. B. Moody, another Alabama director, and the firm of Joseph S. Winter & Co., (embracing the other two Alabama directors,) directly with the fraud perpetrated in Wetumpka a few days prior to the failure of the Bank.   He purchased the cotton at the request of Moody, and J. S. Winter & Co. paid for it in the worthless bills of the Bank.   The consequent liability of directors taking such means with J. Henley & Co., and for the purchase of property on the eve of such a failure, requires no argument beyond the statement of the facts.

As a key, however, to the whole system, it is only necessary to advert to the testimony of Anderson, the superintendent of the business of Jos. S. Winter & Co.—the manner in which he states they received the bills of the Bank, viz., chiefly by the conductor of the railroad; that during the whole period he was in their employ, about three years, he does not remember, nor have any knowledge of, any notes, bills or bonds executed by Jos. S. Winter & Co. to the Bank, for any indebtedness, &c. The whole indebtedness and evidence thereof on the part of Jos. S. Winter & Co. to the Bank was limited, according to his knowledge, (and he was their superintendent,) to the books of Jos. S. Winter & Co; that the plan of settling balances consisted in the farce of making out accounts in April and October of each year, charging up the balances, and the *next day*, or a few days thereafter, entries were made on said books *reversing those previously made.* The system of book-keeping, it seems, was adapted to the peculiar transactions of the Bank and its Alabama coadjutors, and adjusted balances with wonderful facility and dispatch.

We next refer to the report of the condition of the Bank, as set forth in the exhibit made to the governor of Georgia, 31st May, 1851, being the last report so presented. The amount of deposits is $54,648 16, circulation $486,800—$541,-448 16; the amount of assets $820,462 72; surplus after paying circulation and deposits, $278,914 56. Geo. W. Winter proves that the Bank suffered no serious losses after the above report. This report places the appellants in a dilemma, either horn of which, we contend, is an additional evidence of systematic fraud. If the above report is true, why was the draft not paid, and how could the Bank shut down on the public, and stop payment, with assets, according to the last report, (undiminished by subsequent losses,) amounting to a surplus of $278,914 56? If the Bank was not injured by bad debts, what became of the $125,364 81 in specie? of the $130,571 62 balances of banks? of the $352,729 82 exchange maturing? of the $101,482 76 notes discounted? Why did they not answer the interrogatories in the bill, which would have explained all these matters and things? The whole matter is solved by the evidence of Cullom, one of the clerks of Jos. S. Winter & Co. He testifies, that during the thirteen months

he was in the employ of Jos. S. Winter & Co., they issued of notes of the Bank of St. Marys from a million and a half to two millions of dollars.

The defendants are liable as *trustees*, for the amount of the bill of exchange which complainants hold · and the equity of the bill on general principles is clear. It is the peculiar function of a court of chancery to enforce trusts. The complainants do not come into court and ask for relief because they cannot find any of the property of the Bank, and therefore seek to subject the property of its directors, as the opposing counsel seem to think ; but they insist that the defendants used the Bank "as a mere machine," misapplied its funds, and that they are directly liable to them for their debt, as individuals. The Bank is a non-resident, and that would of itself be a sufficient reason to allow the complainants to come into a court of chancery and treat the defendants as trustees holding their funds, without first obtaining a judgment against the Bank. A holder of a note endorsed may sue the endorser without proceeding against the maker, if he be a non-resident.

*Second:* The defendants say that Farley and Moulton ought to have been made parties to the suit. Now it is well settled, that the holder of negotiable paper may sue in the name of a person having no interest therein ; he may be regarded as a trustee.—Gage v. Kendall, 15 Wend. 640. It is no defence to an action, that the property of the note is in a third person ; unless the possession is *mala fide*, and may work prejudice to the defendant, the latter is not entitled to be heard on the subject.—Guernsey v. Barnes & Graves, 25 Wend. 411 ; 2 Sandf. Sup. C. Rep. 188. Nor is it a sufficient objection that the plaintiff in the record is not the party beneficially interested.—9 Metc. 436. The holder of the paper has a right to write over a blank endorsement, &c.—11 Peters 84. It is the decision of our own Supreme Court, in Sawyer, adm'r, v. Patterson, that it is unnecessary to fill up the blank endorsement, even when the description of the declaration is that the note is endorsed to plaintiff.—11 Ala. 526. The statute of 1837 does not extend to blank endorsements. See, too, 15 Ala. 834. The principle applies to proceedings in equity, as well as at law. Our proceeding is in some sense a proceeding at law ; we hold a negotiable paper, and seek to collect it ; it does

not lose its commercial character because we avail ourselves of a remedy in chancery. Besides, there were no equities between Moulton and Farley and the defendants; and if there had been, the complainants would have represented them. They were dormant partners, and need not have been joined.—Collyer on Part. 4; Story on Part. 380; 3 Taunt. 34; 2 Verm. 65; Desha, Smith & Co. v. Holland, 12 Ala. 513.

*Third :* John G. Winter answers that he is a citizen of Alabama. The allegations of the bill as to the non-residence of Winter are not traversable. The complainants having made the required affidavit, and given the necessary bond, are entitled to the extraordinary process of attachment, of which they cannot be divested. Bouvier defines an attachment to be " a writ authorizing the officers of the law to seize the property of the defendant." This is an attachment, whether granted by a court of law or equity. Then the decision of our Supreme Court in Middlebrook v. Ames, 5 Stewart & P. 158, and our statute of 1837, affirming that decision, must govern the attachment writ granted in this case. The statute applies to all attachments. The practice in our courts of law and of equity ought to harmonize. See the reasoning in the case of Kirkman *et al.* v. Vanlier, 7 Ala. 227. The statute of 1845-6 grants an attachment in chancery. Even if he could traverse the grounds of attachment, as to his non-residence, the proof is against him. He cannot do this—he must rely upon his bond if he is wronged; but if he could, the proof is decidedly against him. Winter (John G.) answers that he resides in Montgomery. Even his own witnesses do not say that. Moody, his confidential agent, says either Montgomery or Coosa. His letter to his *son Joseph* is adduced—carefully sealed up by a notary and laid away—and that some two years or more before the failure of the Bank, while he is acting as its president, under its charter, and in the face of the penal laws of Georgia. J. G. Winter was actually in Columbus at the time the bill of exchange was given to complainants, when the Bank suspended, and when the bill was filed and attachments issued, acting as its president; and we had the right to treat him as a citizen of Georgia.

*Fourth :* A judgment is set up which was obtained in Georgia : 1st, the Bank no right to offer the plea—it was in

contempt ; 2d, the answers of defendants nowhere allege the judgment, and of course they can offer no such proof ; 3d, the judgment was not final, and of course could not harm defendants, even if the plea was improperly overruled. It would be a wrong without an injury.—Prince's Dig. 426 ; 2 Kelly 339 ; 4 Ala. 9.

*Fifth:* We rely too upon the statute of 1845–6. Our bill rests finally upon both grounds. The equity of the bill is clear. The statute of 1845–6 is ample. It authorizes a levy upon equitable interests, &c.

*Sixth :* As to the decree being rendered in vacation : The statute clearly authorizes it ; the chancellor has until the next term, and was prepared to render his decree earlier.— Besides, by the agreement of counsel, the decree was withheld, and defendants' counsel actually requested the chancellor to delay it until they could furnish their brief. This cannot now be set up as error.

Every consideration, legal, equitable, and moral, is in favor of the complainants. The proceedings of the defendants are marked with fraud : they owe . the money ; they have misapplied the funds of the Bank, and appropriated them to their own use ; and they merely criticise the regularity of some of the forms of the court. The country ought to be able to look with confidence to the courts, especially to the highest tribunals, and repose with security upon their decisions, satisfied that they will be governed by manly sense, and by an unswerving regard to right, while they respect necessary forms.

P. HAMILTON and D. CHANDLER, on the same side :

I. As to the defence set up by the defendants below :

1. They aver that John G. Winter is a resident citizen of Alabama, and that fact is sufficient to defeat the suit as to him. The suit was begun under the law authorizing attachments in chancery.—Pamph. Acts 1845–6, p. 17. That act is modelled upon the system authorizing attachments at common law : so far as the organization and practice of the courts permitted, the systems are the same. The non-residence of a debtor, when certified by affidavit, authorizes attachment from either court. The abuse of the process, in either case, is guarded

against by bond and security : the levy upon property by the sheriff, its sale, the issue of garnishment, and similar incidents, attach to each system.—Pamph. Acts 17 ; Clay's Dig. 61. Under the earlier laws on this subject, it was indeed held, that the averment on which the attachment issued, might be traversed by the defendant.—3 Stew. R. 226. This decision was not unanimous, and was soon overruled.—Middlebrooks v. Ames, 5 Stew. & P. 158. This last decision was made at June term, 1833; subsequently, in 1837, the attachment law was amended, and the right to traverse was specifically denied : being a legislative approval of the decision of this court. The case, (5 Stew. & P. 158), then, becomes an authority for the construction of the act of 1846, and the traverse of the allegation on which the attachment issues, (in this case the non-residence of John G. Winter,) is not admissible. The defendant's remedy is on the bond which the plaintiffs have given.

In this view, the pleas and answers of John G. Winter, both to the original and amended bill, (for to both the answers are the same,) are inadmissible : they traverse an averment not traversable. The depositions offered by the defendants, were, for the same reason, objectionable,—they are confined to the point of non-residence. But, if material, the answers are not sustained. He asserts his residence to be in Montgomery county ; the testimony, if admissible, shows his residence to be in Coosa county. The depositions of Joseph S. Winter, George W. Winter, and Moody, are inadmissible: they are stockholders in the Bank of St. Marys, and are charged with participating in the frauds alleged to have been committed in its management. They are incompetent from interest. The weight of proof is in favor of the non-residence of the defendant. It comes from old and well-known citizens of Montgomery; while that of defendant comes from his sons, and employees, his cashier, his partner, his agent, his bookkeeper, and his lawyer ; and consists of his declarations, and a letter said to have been written, and which remains in his own custody or in such keeping that he can produce or suppress it ; and the original of that has never been produced, even to the commissioner who took the affidavit of the witness. There is no proof of actual residence in Alabama. No

one swears to being at the house of John G. Winter in Alabama, or that he has ever seen it.—11 Ala. 698. The answer is disproved in any event; for not a particle of proof exists in the record, that John G. Winter ever resided at Montgomery. When there he was merely a sojourner, either at an inn, or at the house of one of his sons.

It may be that he had two domiciles : certainly one in Georgia, which the plaintiffs are justified in regarding as his residence. He had for years been a house-holder there, and engaged in agriculture, as well as in other business, located there ; he held an official position under laws of Georgia, which those laws declared could .be held only by a citizen of Georgia.—Prince's Dig. Laws Ga. 133. He is estopped from denying that he is a citizen of Georgia.—*Ex parte* Straffon's Ex'rs, 10 Eng. Law & Eq. Rep. 279; 2 Conn. R. 223 ; 18 Conn. R. 153, 443. He acted as President of the Bank St. Marys, and complainants were authorized to take it he was rightly so ; and that involved citizenship in Georgia.—3 J. J. Marsh. R. 700. At the time the bill was filed, he was in Georgia, and actively engaged about the business of the Bank, as its president.

2. After the case was prepared for hearing upon the answers first filed, and the testimony all taken, the Winters obtained leave from the register to file an amended answer. This answer avers that Thos. Moulton and Jas. Farley were copartners with Henley, and interested in the bill of exchange sued on, under the style of "John Henley," and should have been made co-complainants. Was it error to proceed to trial without making them complainants? Appellees contend that Moulton and Farley were dormant partners. If dormant partners, though they might be proper, they are not necessary parties.—11 Ala. 603; 12 *ib.* 513; 4 Cowen's R. 717; 4 Wend. 628; Edwards on Parties, p. 46, § 24, p. 56, § 47; Story's Part. § 241, p. 374, n. 2; Story's Eq. Pl. § 241, n. 3; Coll. on Part. § 660-1, notes and authorities. The names of Moulton and Farley did not appear in the style of the firm, and there was no word of company attached to the name of John Henley, to indicate that others were concerned with him ; they were dormant partners.—2 Har. & Gill R. 159, 171; 5 Cowen 534; Story on Part. § 80. In this case we have the assertion of

39

these defendants, that they did not know these parties were interested in the bill of exchange. As to them, then, Moulton and Farley were dormant partners, within the strictest letter, and should not have joined in the suit.—11 Ala. 603 ; 3 *ib.* 733; 6 Pick. 348.

Further, to obviate any objection of this kind, it is submitted, the endorsement of the bill of exchange may be filled up at any time before or after suit brought, to any party, and thereby a sufficient interest will pass to sustain the suit (11 Pet. R. 81, 84) ; and the filling up need not actually be made ; it is sufficient that the right exists.—8 Ala. 628 ; 15 *ib.* 834, 838 ; 11 *ib.* 523, 527 ; and see 9 Metc. 434, 436 ; 15 Wend. 640; 25 *ib.* 411; 2 Sandf. S. C. R. 188; 9 Martin 344. And as to the right of the party who has thus undertaken to sue, the defendants have no concern.—9 Metc. 436; 2 Sandf. 188; 15 Wend. 610; 15 Ala. 839; 3 Madd. R. 97-8.

3. Another defence attempted to be made, is found in the pleading tendered in behalf of the Bank St. Marys, to-wit, that in a suit on this bill of exchange, in the name of John Henley, against the Bank St. Marys, in Muscogee county, Ga., a verdict was rendered in favor of the Bank. This attempted defence of the Bank is destroyed by the transcript of the proceedings in that case, introduced by the complainants. That transcript shows, that while such a judgment was in fact rendered, its operation as a judgment was neutralized by an appeal as provided by the laws of Georgia. The provision of the law of Georgia is found in Prince's Dig. 426. The operation of an appeal is to remove the whole cause to the appellate tribunal, with all its incidents : the former judgment has no force for any purpose (1 Bouv. Law Dic., tit. Appeal; 2 Gall. R. 230; Conkling's Adm. 835; 17 Pick. 142; 20 Pick. 510) ; and so is the law of Georgia.—2 Kelly's R. 329. The complainants have therefore overthrown the defence proposed to be made by the Bank, or in its name ; so that, whether the chancellor erred or not, in refusing to receive that answer, it is shown neither the Bank nor any of the defendants have suffered any injury of which they can complain in this court : even if an error, it is error without injury. But it was no error. The bill was filed in April, 1852 ; the time to answer expired in June ; it was extended by consent thirty days. A

decree *pro confesso* was applied for in July. The bill was amended, and publication against the Bank applied for in August, 1852. Decree *pro confesso* on the amended bill was obtained in October, 1852. On the 21st January, 1853, the pleas of the Bank, which had come in under a commission, were opened by order of the court, and the Bank by its counsel moved that the decree *pro confesso* might be set aside, and offered the pleas as a compliance with the rule of practice. The court will observe, that the paper tendered by the Bank consists of two pleas, averring in substance the judgment of the Inferior Court of Muscogee county, Georgia, as a defence to the bill : not a single allegation of the bill is answered ; and the defence is offered solely in the form of a plea. It is the furthest removed from a full and complete answer; such as contemplated by the rule.—Clay's Dig. 351, § 39. A partial answer may, in some instances, be filed ; but only in peculiar cases, where of necessity the complainant's suit must fail. But in no case, after decree *pro confesso*, can a mere plea setting up a technical defence, not favored by courts of equity, be received—22 Ala. 819.

II. As to the case of the complainants :

The case made by the bills original and amended, is entirely undefended, so far as merits are concerned. The defendants have chosen to rest upon such objections as they could pick up in the course of the suit ; they have not attempted to shield themselves from the serious charges in the bill. As to them, by all the rules of equity pleadings, they stand confessed ; there is not the first attempt at the denial of a single allegation in the bill. The proceeding was commenced under the act of 1846.—Pamph. Acts 17. The Bank is confessedly non-resident—is located in Georgia, and is indebted to citizens of this State. John G. Winter was also a resident of Georgia, or must be taken as such for the purposes of this suit. The other defendants are before the court, as garnishees of the Bank, or its debtors ; John G. and Joseph S. Winter are charged as being immediately liable to pay this debt, by reason of their connection with the Bank in Georgia. It is contended, the bill is clearly sustainable under the statute authorizing attachments in chancery. The complainants go further, and assert that their case also falls within the ordi-

Bank of St. Marys et al. v. St. John, Powers & Co. et al.

nary jurisdiction of courts of equity ; and that they are enti-
tled to decrees against the Winters individually, without
reference to the mere fact of their being debtors of the Bank ;
that the Winters are debtors of the Bank, and should be so
held in a court of equity ; but that, in the eye of the law as
administered in that court,. they will be held to be the Bank
itself, and chargeable with the payments of the debts of the
Bank, created as this debt was. The bill charges on these
parties a course of dealing with the Bank, its issues, assets
and credits, utterly regardless of any thing, other than their
own private emolument; wherein the interest of the public
was never thought of; and their own position, influence and
advantages as trustees of a public institution, were perverted
to private ends ; the laws of this State disregarded and con-
temned, and the creditors defrauded.

The proof sustains all the charges of the bill. The Bank
of St. Marys, and John G. Winter and Jos. S. Winter & Co.,
were one and the same thing. The Bank was moved to Co-
lumbus in 1845. The firm of Jos. S. Winter & Co. were es-
tablished at Montgomery in 1845. The suspension of the
Bank and the suspension of the active business of the firm
were simultaneous. Of the $225,000 of capital stock, up-
wards of $180,000 stood in the name of John G. Winter ;
how much of the remainder was held by him in other names
does not appear. He was the president. The board of di-
rectors consisted of him, his two sons, Jos. S. and Geo. W.
Winter, Moody and Wildman. His son, George W., was
cashier ; the directors received their stock from him. Simul-
taneous with the establishment of Jos. S. Winter & Co. at
Montgomery, the issues of the Bank began to enter into the
currency of the country, till they formed much the larger por-
tion of the currency. The firm of Jos. S. Winter & Co.
dealt entirely in this currency. Their clerks were instructed
to issue it in preference to other notes. Millions of dollars
in its bills were issued by the Winters ; they were the chief
agents in its circulation ; large amounts were on deposit with
them ; notes apparently new were constantly issued by them;
notes are proved to have been signed by the president at their
office in Montgomery ; the cashier, Geo. W. Winter, admits
it may have been done once or twice, or *perhaps oftener*, and that

notes so signed had been handed over to the firm and issued by them. Jos. S. Winter & Co. sent for and received the notes of the Bank, whenever they wanted them; sometimes they came by mail, sometimes by a messenger, but generally by the railroad conductor; and for all these notes trusted with them, and issued by them, Jos. S. Winter & Co. are never known to have given any securities. The cashier of the Bank refuses to exhibit the accounts of the Winters with the Bank; but admits they had large discounts and were profitable customers. He cannot or will not show when the directors met, or that they ever had any meeting: no proof that the board knew of the resolution to suspend specie payment by the Bank—that any minutes were kept, or that they were ever consulted in any of the operations of John G. Winter, the president, though those things were required by the charter.—Prince's Digest, 153. The board of directors were chosen by John G. Winter, and looked upon as an incumbrance—barely tolerated to keep the Bank under organization. All the proof shows that John G. Winter was the manager and controller of the Bank, and he so held himself out. The entries on the books of Winter & Co. were reversed as soon as made; but when correctly stated always showing large debts due to the Bank, which were balanced by fictitious entries. The identity of the parties is shown in the evidence of Holcombe. The Winters instructed the Bank to whom to send its business in Mobile. The Bank draws its bill of exchange, and the cashier writes he has directed Winter & Co. to provide for it. The Winters continued their active agency in issuing the notes of the Bank to the last moment, and after its bill on Holcombe had been protested. In short, the allegations of the bill are fully proven; sometimes as strongly by the significant silence of the witness, as by his direct answers (*vide* the interrogatories put to Geo. W. Winter, and the answers of that witness). And this proof is obtained mainly from the friends and agents of the Winters themselves.

There is nothing to justify or excuse the failure of the Bank to meet its obligations, under the management of John G. Winter and his board of directors. No loss by the Bank is shown—all loss is denied. No account is given of the assets

of the Bank, yet the Bank refuses to pay its debts, and has become insolvent. In June, 1851, the president and cashier reported to the governor of Georgia, that the Bank had in cash, assets, say $271,000; exchange maturing, $352,000; notes discounted, $120,000—743,000. When it failed, its debts were, bills, $355,000 ; deposits, $90,000 ; protested drafts, $140,000—$585,000 ; surplus, $158,000. And for some of the debts due at the time of its failure, the testimony shows that John G. Winter has arranged, and has recognized his individual liability.

The ignorance of John G. Winter of the amount of the debt of his son Joseph S. Winter to the Bank, in liquidation of which he joined that son in executing notes to the Bank, is edifying. He neither knows the amount, nor any circumstance connected with the transaction, but the date of the notes. The fact he does know is striking. How came that settlement of Jos. S. Winter with the Bank to be so nearly simultaneous with this transaction with the plaintiffs ? How came there an individual debt of Jos. S. Winter, in place of a debt due by Winter & Co. ? or that any settlement at all was had ? Winter & Co. are the parties that are shown to have dealt with the Bank and obtained discounts in it; and this settlement so opportunely made is the first of any kind that has been hinted at as being made with either of that firm.— Such items as have leaked out of the carefully guarded dealings of these parties, are suggestive of explanation, which the defendants have declined to give.

From the proof, the complainants insist the charges of the bill are fully established, and a case is made out, of the use without stint, and without accountability or control, by John G. Winter and Jos. S. Winter & Co., its president and one of its directors, of the assets, issues, credit and property of the Bank of St. Marys, for their private and individual gain, while other stockholders, if any, and the creditors have been defrauded of their property. This is a breach of their duty for which they are liable in their individual estates. The president and directors of a bank hold the position of trustees ; the assets and property of a bank or any moneyed corporation of that kind, form a trust fund : and this fund, the directors or trustees are bound to administer for the use and

benefit of the creditors and stockholders. This principle is fully sustained by the cases.—Wood *et al.* v. Dummer *et al.*, 3 Mason's Rep. 308, 311–313 ; Taylor v. The Miami Exporting Co., 5 Hammond 162 ; S. C. 5 Cond. Ohio Rep. 99, 101, 103 ; Robinson v. Smith, 3 Paige 222, 231,–2 ; Cunningham v. Pell, 5 Paige, 607, 612; Perry *et al.* v. Millaudon, 3 Louisiana, 568, 571, 585, 594. These are all cases of proceedings against the directors of corporations, to recover compensation for losses, caused by fraudulent or negligent management of the corporation funds—some are suits by creditors, others suits by shareholders. Dudley v. Price, adm'r, 10 B. Monroe 84, 86, is a case by creditor against shareholder, for receiving dividends that should have gone to pay the plaintiff's debt; the claim was sustained. The rule is, that the trust funds can be followed wherever they can be found—to whosesoever hands they may come, who had notice of the trust ; directors and stockholders are chargeable with notice by virtue of their position.—3 Mason 312 ; 10 B. Monroe 86; 7 Eng. Law & Eq. R. 234. The directors (says one of the cases) who willfully abuse their trust, or misapply the funds of the company, are personally liable as trustees to make good that loss, equally so, if they suffer the corporate funds to be lost or wasted by gross negligence.—3 Paige 231 ; 5 *ib.* 612 ; 3 Louisiana 568; 2 Story's Eq. § 1252 ; 2 Johns. Ch. 389 ; 1 Edward's Ch. 513 ; *ib.* 84, 88.

The bill is well brought in form. The Bank is made a party defendant, and the directors are alleged and proven to be still directors, holding office in the Bank—and are charged and proven to be the mere tools of John G. Winter, and "men of straw" of his creation. The proper forum to administer relief in this case is a court of equity.—15 Mass. 505, 522 ; 16 *ib.* 15 ; 12 Metcalf 371. If the case were, the Bank by new officers, in place of those charged with these breaches of trust, seeking to recover for the use of the Bank losses thus created, a court of common law might furnish relief.—3 Wend. 130. But the same parties still remain in office and still control its assets. The stock of the Bank is shown to be almost exclusively the property of one man—and that man the party who has actually managed the corporation for the benefit of himself and his firm. Equity is the only tribunal that can

administer adequate relief.—3 Mason 310 ; 15 Mass. (522) 491. But in this case, the court, by the law under which it proceeds (attachment law of 1846) administers justice, according to the principles both of law and equity. . Certain facts give jurisdiction of the cause : these conditions do not refer to the nature of the claim sought to be enforced, as legal or equitable, but authorize the court to administer a remedy, whether the claim on general principles be of legal or equitable cognizance.—Act 1846, Pamp. Acts 17, 19. We have no special legislation on the subject of closing banks for breaches of duty ; if such existed, there is an abundance of facts to wind up the affairs of this Bank of St. Marys over and over again.—6 Paige's R. 497, 509.

Again ; the bill charges, and the testimony sustains the charge, that John G. Winter and his firm have engaged in the prosecution of a banking business, and in the issue and circulation of the notes of a foreign bank, in violation of the laws and policy of this State. Alabama has seen fit to declare that it shall not be lawful for any foreign bank or corporation, by agent or otherwise, to discount bills or promissory notes in this State (Clay's Dig., 133, § 1) except by the exclusive use of gold and silver coin, or bills issued by domestic banks.—Act 1848, Pamp. Acts 81. She has also seen fit to forbid the issue of any notes for circulation as money by any company, or corporation, other than the chartered banks of the State.—Acts 1839, p. 93. She has declared that " every person who may be a partner or stockholder" in such company or corporation, "shall be liable to the holder of any note, bill, bond or post note, issued, written or put in circulation," by such company or corporation, for the amount of such note, bill, &c., which may be recovered by the holder before any court having competent jurisdiction.—Clay's Dig., 133, § 3. The answers of these defendants admit that they are the agents in this State of the Bank of St. Marys : the evidence is conclusive of their constantly and to large amounts issuing and putting in circulation the bills of that Bank. They are confessedly stockholders and active managers of its affairs, and the whole case shows such a connection of the Winters with the Bank, and such an agency about its business, that to hold them guiltless under the law,

would be to sanction a fraud upon the statute. It is contended, therefore, that these defendants, John G. and Jos. S. Winter, under the legislation of the State, and by their dealing with the issues of the Bank within this State, have made themselves personally liable to pay the debt, and that the decree was properly rendered by the chancellor declaring them liable. Atterberry v. Knox & McKee, 4 B. Monroe 90, 92, is an authority upon a statute of Virginia and Kentucky, similar to the Alabama statute, to show that the Bank of St. Marys falls within the prohibition of the law, and fixes the personal liability upon these defendants.

LIGON, J.—We deem it unnecessary to consider separately each objection which has been made to the recovery, and proceedings in this case in the court below, as they are presented in the assignments of error in the record ; since, to do so would only tend to lengthen this opinion unnecessarily. It will be sufficient to classify the assignments of error and thus pass upon them.

1. It is insisted that there is no equity in the bill, as amended, which would give the Chancery Court jurisdiction under the ordinary powers of that court; and that the bill is not so framed as to bring it within the provisions of the act of 1846.

On the first branch of this objection it may be remarked, that strict trusts are admitted to be open at all times to the examination of a court of equity, and an unfaithful trustee has been constantly brought before it, and made both to discover the fund belonging to the trust, and to account for its management and misapplication. If fraud in the management of the fund is charged in the bill, by one interested in the trust estate, and who has been injured in consequence of such fraud, there is no doubt of the jurisdiction of the court. If, superadded to the matters of trust and fraud, the bill, as in this case, seeks a discovery and account, it will embrace nearly every ground on which the original jurisdiction of the Chancery Court is said to rest. In such case, it is immaterial whether a court of law can afford to the complainant partial or full relief, in the matter complained of, it cannot hinder the aggrieved party from resorting to a court of equity for redress.

It is charged in the bill under consideration, that the complainants are creditors of the Bank of St. Marys, to the amount of twenty thousand dollars ; that said Bank has failed to meet its liabilities, and as a corporation has become insolvent ; that the defendant John G. Winter is its reputed and acting president, and owner of nearly all its stock ; and that Joseph S. Winter is also a stockholder and director in the institution ; that for sometime before the failure of the Bank, its affairs had been managed exclusively by John G. Winter, or those who were subject to his will and dictation ; that under such management it had been used for his own purposes, and that of the firm of Joseph S. Winter & Co., which was engaged in business, as bankers and brokers, in Montgomery, Alabama ; that the Bank was chartered by the State of Georgia, and located at Columbus in that State, but that for several years past all its operations have been carried on in Montgomery, Ala., by the house of Joseph S. Winter & Co., who issued and put in circulation its bills, in Alabama, to an amount exceeding five hundred thousand dollars, and dealt in them for their own private emolument, without any security to the Bank, and without the knowledge, consent, or action of the board of directors, if, indeed, there existed such a board ; that the complainants were holders of twenty thousand dollars of the bills of said Bank, which were issued and put in circulation in this State, by John G. and Jos. S. Winter, and which were held by them at the time the Bank first refused to pay specie, and in exhange for which the draft of the cashier for a like sum, now exhibited with the bill, had been given to them ; that by means of these illegal and fraudulent practices, Jos. S. Winter & Co. had realized a large fortune, while the Bank has become insolvent. · The bill further alleges that the estate thus accumulated by John G. and Jos. S. Winter, and Jos. S. Winter & Co., is of right the property of the Bank, and should be charged in their hands with the payment of the demand of complainants. It is also alleged, that the Bank has been rendered insolvent by the conduct of the stockholders, in withdrawing from its vaults the capital stock paid in by them on their subscriptions, by way of loans or otherwise, leaving the institution destitute of the means of paying its liabilities, or redeeming its bills. A discovery as

to these matters is prayed, and there is a prayer for general relief.

It is beyond doubt that the directors of a banking or other corporation are, in the management of its affairs, only trustees for its creditors and stockholders, and are bound to administer its affairs according to the terms of its charter, and in good faith. If they fail in either respect, they are liable to the party in interest who is injured by it, for a breach of trust, and may be made to account with him in a court of chancery.—Attorney General v. Aspinall, 2 Myl. & Cr. 625 ; Same v. Kett, 2 Beavan ; Same v. Cor. of Leicester, 7 Beav. 176.

By the original charter of the Bank of St. Marys, a board of directors, seven in number, is required in the management of its affairs.—Prince's Digest 133, § 5. By the amended charter, the number is reduced to five, three of whom constitute a quorum to do business. These are required to be elected by the stockholders annually, and are to serve until the end of the first Monday in January next after their election, and no longer. At their first meeting after the election, they are required to choose one of their number to act as president. In the act of incorporation, certain fundamental articles of the constitution of said corporation are inserted, as a part of the charter. By the second of these articles, the qualifications of a director are prescribed, and are as follows : "None but a stockholder, entitled in his own right to *ten shares, being a citizen of this State,* and not being a director of any other bank, shall be eligible as director."—Prince's Dig. 134, rule 2. By the tenth of these rules it is provided, that "The bills obligatory, and of credit, notes, and other contracts whatever, shall be binding and obligatory on said corporation ; *provided,* the same be signed by the president, and countersigned or attested by the cashier of said corporation."—Prince's Dig. 135, rule 10. This charter was granted in December, 1836, and was to continue until the first January, 1856. The location of the Bank was subsequently changed from St. Marys to Columbus, by act of the Legislature of Georgia. The fifth section of the act of incorporation authorizes the election of directors, and the full organization of the Bank, so soon as fifty thousand dollars of the

capital stock should be actually paid in in gold or silver.— Under the original and amended charter the Bank went into operation, and in the month of April, 1852, it suspended payment, and has since been insolvent.

It appears by the bill and proof, that, at the time of the suspension, the board of directors was composed of John G. Winter, president, and L. B. Moody, P. H. Wildman, Geo. W. Winter, (who was also cashier,) and Joseph S. Winter; that the four last named persons were the owners of only five shares of stock each, and Jos. S. Winter and L. B. Moody were resident citizens of the State of Alabama. John G. Winter owned eighteen hundred and twenty-seven shares, the whole capital being only $225 717.

The board was not qualified to act as directors of the Bank of St. Marys, for the reason, that but one of its members possessed the necessary qualification as a stockholder. None but John G. Winter owned, according to their own showing, as many as ten shares of stock in his own right. Jos. S. Winter and Moody were further disqualified because of their non-residence. The operations of the Bank, under their direction and control, were therefore illegal and fraudulent.— When to this is added the fact, which is directly charged in the bill, and is not denied in the answer, although, from its very nature, it must have been within the knowledge of John G. and Jos. S. Winter, that the stockholders had withdrawn the amount of their subscriptions from the vaults of the Bank, in the shape of loans or otherwise,—it establishes, beyond controversy, that the stockholders themselves participated actively in the fraud which was practiced upon the note holders and others creditors of the institution.

The capital stock of the Bank, with all its property and assets, is to be regarded as a trust fund for the payment of creditors; and the stockholders, directors, and agents of the Bank, are trustees for their benefit, and as such may be made to discover and account in chancery. So, also, if any one interfere with the trust fund without authority, and squander or misappropriate it, he will be held to be a trustee, and made to account as such.—7 Beav. 175.

In the present case, we have no hesitation in saying, that the bill may be retained under the ordinary jurisdiction of

the Chancery Court, without resorting to the act of 1846 in order to give the court jurisdiction.

2. But the bill is also good, under that act, as to John G. Winter, and the Bank of St. Marys.

The act provides a remedy by attachment against non-resident debtors, who have property in this State, whether their claim to such property be legal or equitable. All that is required of the creditor, in order to entitle him to the remedy provided by the act, is, that he shall swear to his demand, to the non-residence of his debtor, and to the existence of legal or equitable estate belonging to him within the limits of this State ; and that he (the creditor) should execute an attachment bond.—Sess. Acts 1845–6, p. 17.

We do not understand the act to require that these facts must be made to appear by an affidavit separate and apart from the bill. It will suffice, if the bill sets them forth with clearness, and is verified by the oath of the creditor, or some person for him.—Flake & Freeman v. Day & Co., 22 Ala. R. 132. The act is remedial in its character, and as such should receive a liberal construction. In this bill, the indebtedness of the Bank is by contract, for the payment of twenty thousand dollars, and this distinctly appears by its allegations ; so, also, is the fact of its location in the State of Georgia, and its title to property and choses in action in this State. The bill is verified by the oath of Newton St. John, one of the complainants ; and this is a sufficient compliance with the requirements of the act of 1846, to authorize the court to take jurisdiction of the case, as to the Bank, under that statute, and to issue the attachment therein provided. The allegations of indebtedness by John G. Winter, and his non-residence, are set out with equal clearness, and the bill is good as to him in this aspect, as well as in the first.

But it is said that his indebtedness does not appear by the bill, and, even if it did, his non-residence is denied in his answer, and that the answer is sustained by the proof.

On the former of these points, we think his individual indebtedness in the sum sued for is sufficiently averred. It is true, it does not exist by contract, nor is it evidenced by any writing ; but it is not the less a legal demand against John G. Winter, in his individual character, for the whole amount

of the sum claimed by the appellees. It is alleged in the bill, that John G. Winter and Joseph S. Winter *issued and put in circulation in this State* more than five hundred thousand dollars of the bills of the Bank of St. Marys ; and that the bills of that Bank which the appellees held, and on account of which the draft exhibited with the bill was drawn, were of this class. Neither of these allegations is denied by John G. Winter, although he should have known whether they were true or false ; and under these circumstances, they must, as against him, be taken as true. It is charged, also, that John G. Winter is the principal stockholder, and, under our statute, he is individually liable to the holder, for every dollar of the notes of the Bank of St. Marys which he issued, or put in circulation, in this State.—Clay's Dig. 133, § 3. The appellees, therefore, might well proceed against him as a non-resident debtor under the act of 1846.

But, it is said, he has, by his answer, put the fact of his non-residence in issue, and by his proof shown that this allegation in the bill is untrue.

This part of the answer must be taken as a plea in abatement to the jurisdiction ; and as the attachment under the act of 1846 is made, by the act itself, to conform to the suing out of that process at law, we are inclined to the opinion that the proceedings under it, as it respects the pleadings, must be governed, as nearly as practicable, by the same rules ; and, as in a suit at law under our ordinary attachment statutes, the particular grounds on which that process is sued out are not allowed to be traversed by such a plea, neither can it be done under the act of 1846.

But, we apprehend, the defendant John G. Winter will not be allowed to set up this matter as a defence to this bill, for another reason : It is shown that, up to the time of the suspension of the Bank, John G. Winter held himself out to the world as its president, and acted as such ; he cannot now deny that character, nor aver in a controversy with one who has dealt with that institution while he acted as such, that he was not qualified to hold that office. By the charter, the president is required to be chosen from the directors, and these are required to be citizens of the State of Georgia ; and John G. Winter must be held to reside there.

The bill, as to him, is good, both under the statute of 1846, and as one appealing to the ordinary jurisdiction of the court of equity ; and, as it contains a prayer for general relief, will warrant any relief which that court could grant under its allegations.

3. We have said, that the bill is well filed under the act of 1846 against the Bank of St. Marys. This institution is a foreign corporation, and is shown to be the debtor of the appellees to the amount claimed by them. This indebtedness, however, is questioned by the counsel for the appellants, who insist, that the draft of Geo. W. Winter on Holcombe was accepted by Henley's agent as a payment of the notes of the Bank which he held, and which were surrendered by him at the time the draft was delivered.

The rule is, that when one security is substituted for another, without any new consideration passing between the parties, the substituted security does not extinguish the existing indebtedness, unless it is so agreed between the parties, and there is no fraud on the part of the debtor.—Toby v. Barber, 5 Johns. 68 ; McGinn v. Holmes, 2 Watts 121 ; Higgins v. Packard, 2 Hall 547 ; Chastain v. Johnson, 2 Bail. 574 ; Coxe's R. 85 ; 9 Conn. 23.

In the present case, it appears that the notes of the Bank were surrendered, and the draft accepted by the creditor, solely for the accommodation of the Bank, and not in payment. For this reason, the Bank cannot set up the draft as a payment of the notes held by Henley. Again ; the draft on Holcombe was received upon the assurance of the agents of the Bank that it would be promptly paid ; when it is clear that, at the time it was drawn, as well as at its maturity, the Bank did not have the necessary funds in the hands of the drawee, and consequently had no reason to believe that it would be honored or paid. These facts were known to the Bank, but unknown to the agent of Henley, so that the Bank is justly chargeable with fraud in inducing its creditor to receive the draft on Holcombe. In this view of the case, its indebtedness would not have been extinguished, even if the draft had been accepted as a payment: the fraud would prevent it from operating as such.—Lake v. Gilchrist, 7 Ala. 955 ; 15 Johns. 475; 2 N. & M. 102; 12 Pick. 126; 1 ib. 415; 11 Mass. 359.

Had this draft been drawn in good faith, and had the Bank been the drawer, still, as it is not shown to have been taken in actual discharge of the notes surrendered, it would not amount to a payment. As it is, however, the most favorable light in which the transaction can be viewed for the Bank, is, to regard the draft of Geo. W. Winter as a substituted security in the hands of the appellees, and to treat it as the note or draft of a third person, substituted for the bank bills which have been surrendered. Thus considered, the receipt of the bill of exchange, or draft, imposed no other obligation on the appellees, than its presentment to the drawee for payment ; if this was refused for want of funds of the drawer, the holder might at once proceed against the Bank, on its original indebtedness.—Printems v. Helfried, 1 Nott & McC. 187 ; 1 Esp. 245 ; 7 Term R. 243–58 ; Markle v. Hatfield, 2 Johns. 455.

The holders of this draft did more : they caused it to be regularly protested for non-payment, and notice of such protest to be given to the drawer. Our conclusion is, therefore, that the Bank is debtor of the appellees to the amount of the notes, and no judgment at law is necessary to enable them to proceed against it in equity for the collection of their demand, under the act of 1846.

4. But it is said that the Bank is not in court for any purpose, as the order of publication against it is fatally defective; and that the decree *pro confesso* being also irregular, it was error in the court below to proceed to a final decree against it. It may, we think, be safely conceded, that both the orders of publication and the decree *pro confesso* before the register against the Bank are defective, and still the final decree is correct. We have already held, that where a defendant in chancery appears by his solicitor, and makes no objection to the irregular manner in which he was made a party to the case, such appearance amounts to a waiver of all irregularities in the service of process and the decree *pro confesso* taken against him.—Mobile & Cedar Point R. R. Co. v. Talman *et al.*, 15 Ala. 472 ; Davenport v. Bartlett & Waring, 9 *ib.* 179 ; 5 *ib.* 158. In this case, the Bank appeared by a solicitor of the court, for several purposes, after this decree *pro confesso* was entered, and on his application orders were made in its

favor. The first of these was an order, made on the application of the Bank, for a commission to take its answer, which was granted ; next a motion was made by it to set aside the decree *pro confesso*, (not for irregularities, but in order to allow it to file a plea *puis darein continuance*,) which was refused ; and lastly, the same solicitor filed cross interrogatories on behalf of all the defendants, and, of course, including the Bank. Superadded to all this, the Bank appears here, and assigns for error the action of the court below in refusing to set aside the decree *pro confesso* in order to let in its plea ; thus indirectly admitting its appearance in that court, and directly complaining of what was there done on its appearance. It cannot be heard in this court to complain of such irregularities as are cured by an appearance without objecting to them in the court below ; nor can it, after such appearance, claim, in this court, rights which only belong to a defendant who has not submitted to the jurisdiction of the court below. Cullum v. Batre, 2 Ala. 415 ; Davenport v. Bartlett & Waring, *supra*.

While the Bank, by its appearance and submission to the jurisdiction of the court below, has deprived itself of the right of objecting to the regularity of the service of process and the decree *pro confesso*, it does not forfeit the right to review in this court the action of the chancellor in refusing to set aside the decree *pro confesso* on its motion. But did the court err in overruling the motion to set aside the decree *pro confesso*, in order to allow the Bank to file its plea? Our statute (Clay's Dig. 251, § 39) provides, that no decree *pro confesso* shall be set aside, but upon filing a full and complete answer to the bill. This is the general rule, and we know no instance in which it has been departed from in favor of filing *a plea*. That its letter has been departed from in favor of a partial answer, containing matter which, if true, put an end to the case once and forever, is true ; and we still adhere to the correctness of that practice.—Bentley *et al.* v. Cleaveland, 22 Ala. 814. That case, however, not only does not countenance the doctrine that such decrees should be set aside for the purpose of allowing a mere plea,—so far from doing so, it expressly holds that such a practice would be wholly without authority. It is there said, " We cannot well see whence the

40

court derived its authority to direct this answer to stand for a plea, and to be tried as such.   Nor do we think, under our practice, a defendant, after a decree *pro confesso*, has a right to put in any defence by way of plea, any more than under the English practice he could do so after answer filed.   Under both systems, it would be an anomaly to find a plea allowed at this stage of the proceedings." Indeed, under our practice, it may well be doubted, whether a plea, or special demurrer, would be received at any stage of the case, if it was unaccompanied by an answer.—Childress v. Crawford, 1 Ala. 482. Our statute, which allows the matter of both pleas and demurrers to be embraced in the answer, was evidently intended to avoid the delays incident to the English practice, and to hasten the trial of the case on all the issues of both law and fact at one and the same time.   Be this, however, as it may, there is no rule, either of our own or the English Chancery Court, which allows a plea, technically so called, to be interposed after a decree *pro confesso* against the party who offers it.   The ruling of the court below, in this respect, is free from error.

The view which we have taken on this part of the case renders a special examination of the errors assigned in relation to the decree *pro confesso* unnecessary.   The decree *pro confesso*, rendered by the chancellor on the hearing, was not needed in order to enable him to proceed to a final decree, and no injury or benefit can result to either party from its rendition.

5. The next assignments of error relate to the final decrees against Joseph S. and John G. Winter as individuals, and as the firm of Joseph S. Winter & Co.

We have already seen that the conduct of the directors of the Bank of St. Marys, in allowing the stockholders to withdraw the amount of their subscriptions from its vaults, and in permitting .Joseph S. Winter & Co. and John G. Winter to use, without security, more than a million and a half of its funds in their own private business, is a fraud upon the creditors, and would not only render the directors liable for the sums thus fraudulently withdrawn, but would render each agent of the Bank who participated in it liable in his individual capacity to the creditors, for so much of said sums as

could be traced to his hands.—Att'y General v. Corporation of Leicester, 7 Beav. 176. It is also clear, that, as to the creditors, these directors and agents are trustees, and as such liable to account with them for such sums as may have been lost by their mismanagement, or misapplied by themselves; and in this respect, the Chancery Court may afford relief independent of the act of 1846.

It is shown by the proof in this case, that Joseph S. Winter was a director of the Bank of St. Marys, as well as a partner in the house of Joseph S. Winter & Co. It is further shown, that this firm was the agent of the Bank, in which capacity it received largely more that a million of dollars of its notes, without any security whatever, and used them in its own business as exchange brokers, the partners charging themselves on their books with the funds so sent to and used by them, and at fixed periods causing these entries to be reversed. It is also proved, that the house of Joseph S. Winter & Co. commenced its business as brokers almost contemporaneously with the removal of the Bank to Columbus, and ceased to do business concurrently with the suspension of the Bank, at that time being indebted to the Bank upwards of one hundred thousand dollars, for which sum this insolvent institution, under the immediate direction and almost absolute control of these partners, received in payment the notes of Jos. S., with John G. Winter as surety, at *two* and *three* years.

By some singular and unexplained, and to us inexplicable, lapse of memory, the parties to these notes, in their answers under oath, say they are unable to state the precise amount of this indebtedness. The proof shows, however, that, without the intervention of the board of directors, they received from the cashier, who was the brother of one of them and the son of the other, the large sums above named, without security, and used them for their own advantage and profit. It also shows, that Jos. S. Winter & Co. received unsigned notes of the Bank of St. Marys, which were signed by the president, John G. Winter, in the city of Montgomery in this State, where the firm did business, and were put in circulation by them in this State. It also shows that a large amount of the bills of said Bank, apparently new and before unused, were received by them and put in circulation in Alabama. These

things could have been explained (if indeed they admit of any explanation) by these partners in their answers, but they are silent in respect to them. That silence, when they are so directly charged in the bill, and must be within their knowledge, must, with the other proof in the record, be taken as conclusive of their truth. The rule is, that when one, having a knowledge of the trust, intermeddles with the trust estate, and converts it to his own use, he becomes a trustee ; and a court of equity will follow the fund into his hands, to make him account, not only for the fund itself, but for all profits he may have made by its use ; for a trustee will not be allowed to make a profit out of the trust estate, and take it to himself. Calhoun v. King, 5 Ala. 523 ; Hill on Trustees, 114, 534;

How then stands the case as to Jos. S. Winter ? He is a stockholder in the Bank of St. Marys, and in Alabama issues and puts in circulation the bills of that institution, to an amount greatly exceeding the demand of the appellees. Twenty thousand dollars of the notes so issued and put in circulation come into Henley's possession, in the regular course of his business. The Bank, on presentation, refuses to pay them, and becomes insolvent ; and Henley and his transferrees now call on Joseph S. Winter to pay them. He is, under our statute, clearly liable for their payment.—Clay's Dig. 133, § 3.

It is no answer to this, to say that he is a stockholder only to the amount of five shares, at one hundred dollars each, and consequently should not be made liable for a larger sum. His liability does not arise under or by virtue of the charter of the Bank of St. Marys, nor in this respect can that instrument exercise any influence in fixing its amount. It springs out of our statute, and to that alone we must look to ascertain its extent. That declares, it shall be to the amount of the bills so issued and put in circulation. The Bank of St. Marys, in the issues thus circulated in this State, must be regarded as an unchartered banking association ; and if its stockholders put its notes in circulation within the limits of Alabama, the law gives to the holders of such notes a right to recover their nominal amount of such stockholder.

Again ; Jos. S. Winter is shown to have misused and applied to his own use very large sums of the funds of this Bank, by means of which, with other causes, it has become insolvent ;

he must, therefore, account to the creditors as trustee for the sums so received and used by him, and for the profits arising from such use. He was a director of the Bank, as well as its agent, in these transactions; and good faith and common honesty both require that he should be made to account for the sums thus received by him and fraudulently used for his own emolument. There is something in the final adjustment of his accounts with the Bank, as set forth in his answer, from which fraud in that transaction becomes an irresistible inference. The Bank has large issues out, and is wholly unable to redeem them; it is about to declare itself insolvent. It has a very large claim on a solvent debtor, arising out of money furnished or lent to him, and among the very last acts of its corporate existence, it extends the time of payment to *two and three years*. This debtor is a director, and his surety is both president and director. It is impossible that such a transaction can be otherwise than a fraud on the creditors of the Bank. In this aspect, also, he is primarily liable to the appellees, and it needs not the process of garnishment under the act of 1846 to reach and charge his indebtedness to the Bank with the payment of this debt.

6. For the reasons given, showing the liability of John G. and Jos. S. Winter to account as agents of the Bank, and as such trustees for the creditors, we are persuaded that the firm of Jos. S. Winter & Co. is equally liable.

7. It is objected, however, that the decree cannot be sustained, because the proper parties complainant are not before the court; and it is insisted that Moulton and Farley were partners with Henley, and as such should have been joined. From all that appears in the record, they were only dormant partners, and their names do not appear in the transaction with the Bank. St. John, Powers & Co. have the entire legal interest in the draft, by endorsement from John Henley, and a perfect equity against the Bank on account of the notes surrendered to it, at the time the draft was drawn. In the whole transaction, from beginning to end, Moulton and Farley do not appear to have been known in it; and if they have any interest, it can be properly represented and protected by Henley, under whose name alone they did business, and with whom alone the Bank appears to have dealt.—Lord

v. Baldwin, 6 Pick. 348; Coll. on Part. §§ 660,–1; Shropshire v. Shepperd, 3 Ala. 733 ; Desha, Smith & Co. v. Holland, 12 *ib.* 513 ; Monroe v. Ezzell, 11 *ib.* 603.

The strongest evidence of the partnership between Moulton, Farley and Henley, to be found in the record, is the affidavit of J. S. Winter, which, it was agreed by the appellees, should be treated as testimony. This affidavit states, that these three persons were partners, and before the draft mentioned in the bill was given, had inserted a notice in a newspaper published in the city of Montgomery, announcing that fact to the world, and that their business would be conducted under the name of John Henley ; and that Moulton and Farley were active, managing members of said firm. This evidence is not sufficient to show that Moulton and Farley were to be held as anything more than dormant partners of the house or firm of John Henley.

Gow, in his treatise on Partnership, (pp. 12, 13,) describes and defines the several kinds of partners. He says: "An actual, ostensible partner, is a party who not only participates in the profits, and contributes to the losses, but who appears and exhibits himself to the world as a person connected with a partnership, and as forming a component member of the firm. A *dormant partner* is likewise a participant in the profits of the trade; *but his name being suppressed and concealed from the firm,* his interest is consequently not apparent." The same distinction may be found in Watson on Partnership, pp. 34, 46. He says : "Sometimes all the partners in trade do not appear ostensibly to the world, though they share in the profits and loss, &c. *Where they do not suffer their names to appear in the copartnership firm,* but at the same time receive their share of the profits, and bear their risk of loss, they are styled dormant partners."

In Leveck v. Shaftoe, 2 Esp. Rep. 468, Lord Kenyon said and held, " that if a person had been a partner, *and his name in the firm,* and he afterwards withdrew his name, but continued to receive part of the profits, though such person still continued liable to all the demands against the partnership, on the ground of the profits he derived, he would not allow persons who dealt with the firm, *without his name appearing in it,* to avail themselves of the objection of such partner's not

having joined in the action, for the purpose of a nonsuit."—
To the same effect are the cases of Lloyd v. Archbowle, 2
Taunt. 324 ; Lucas *et al.* v. De LaCour, 1 Maule & Selw. 249;
Bryden v. Taylor, 2 Har. & John. 396; and Mitchell v. Dall,
2 Har. & Gill 159.

In this case, it appears, the firm was carried on under the
name of John Henley alone,—all its transactions were done
in his name. In his name the Bank of St. Marys dealt with
the firm ; and the interest of the dormant partners cannot be
set up now, when his name only is used in a bill in chancery,
filed in behalf of the firm against those who have dealt with
them under his name alone, in order to defeat a recovery.—
The only interest these appellants can possibly have, in having
the names of these dormant partners spread upon the record
in this suit, is, that the decree rendered in it may conclude
them as to the matters in controversy. It is not necessary
that they should be named, in order to be concluded. John
Henley, in whose name this security is taken, had the unques-
tionable right to negotiate it in his own name, and thus pass
the entire interest in it to his endorsee or transferree, without
consulting his dormant partners. To them he is accountable
as trustee for all securities thus taken by him in the business
of the firm, and in that character he must be considered as
representing them in this suit. It is well settled, that in all
controversies concerning a trust estate, where the trustee can
fully represent the interest of all the beneficiaries, they are
not necessary parties to the bill.—Walker v. Miller, 11 Ala.
1067, and cases their cited.

That they may, if not too numerous, be proper parties, is
conceded ; but this is not the question here. If the decree
against or for the party who represents their interest would
conclude them, it is all the appellants have a right to demand;
and regarding Henley as holding the entire legal interest of
the firm, in trust for his dormant partners, in proportion to
their several interests in this security, he alone is a necessary
party, either at law or in equity. The confidence reposed in
him by his partners, in permitting the business of the firm to
be carried on in his name, creates him trustee for them, as to
all assets or property appertaining to the firm which he may
hold in his own name. He may be sued alone for the debt of

the firm, and the judgment against him may be levied of the goods of the firm.—Lord v. Baldwin, 6 Pick. 348. He may, also, as we have seen, sue in his own name, and recover, notwithstanding it is objected that he has dormant partners.

It is difficult to conceive upon what principle the partner, in whose name the business of the firm is conducted, is allowed to exercise this unlimited legal control over the property of the firm, unless we refer it to the principles which govern trustees in whom are vested the entire legal estate, with the absolute right of control, being accountable only in equity for an abuse of their trust. If we are correct in this conclusion, and of its correctness there can be but little doubt, then the case cited from 11 Ala. 1067, is conclusive against the necessity of making Moulton and Farley parties to this bill.

8. It is further argued that the final decree is erroneous, inasmuch as it directs the sale of the stock of J. G. Winter in the Central Plank Road : this, it is said, is not leviable under attachment. Such stock is to be regarded as a chose in action, and constitutes a portion of the equitable estate of its owner, and as such may be charged in equity under the ordinary powers of that court, and is expressly chargeable by attachment under the first section of the act of 1846.—Sess. Acts 1845-6, p. 17.

9. It is further assigned for error, that the chancellor rendered his final decree in the cause in vacation. It appears from an agreement between the solicitors for the parties in the court below, that this was done with their consent, and was requested by the solicitor for the appellants, as a favor to him. It certainly would be extraordinary to allow the appellants, by their solicitor, to obtain time in the court below, as a matter of favor to them, under an agreement to waive any irregularity which might result from the rendition of the final decree in vacation, and having thus thrown the opposite party and the chancellor off their guard, to permit the appellants to assign such irregularity for error in this court. Consent cannot confer jurisdiction ; but it can waive error, or cure an irregularity. In this case, the court had jurisdiction of the cause, both as to its subject-matter, and the parties ; it received the submission of the case *during a regular term of the court,* and the act of pronouncing the decree in vacation is a

mere irregularity, which is cured by the consent of parties. Minor 35. The case of Cullum v. Casey & Co. (1 Ala. 351) is different from this. In that, the case was submitted out of term time, without the consent of the parties, and the decree final was in like manner pronounced out of term time and without consent. Such a decree could not be supported.

It is due to the solicitors for the appellants in this court to say, that they had no agency in making the agreement in the court below, nor does it appear in the record that they were concerned in the case in that court.

10. We have seen that the Bank of St. Marys is not, under its charter, liable on the draft drawn by Geo. W. Winter, its cashier, and, as such is the case, it cannot be held to be liable for the damages resulting from the non-payment and dishonor of this draft. The decree of the chancellor, in respect to these damages, is erroneous, and to that extent must be corrected; and a decre here rendered for the amount of the bank bills, with legal interest thereon.

The decree of the chancellor, thus amended, must be affirmed, at the costs of the appellants, both in this court and the court below.

GOLDTHWAITE, J.—I am satisfied that Moulton and Farley, upon the evidence which the record discloses, cannot be regarded as dormant partners of the firm of John Henley, and for that reason they should have been joined as plaintiffs. In other respects, I agree with the results of the opinion.